**Joshua R. PUSHKIN, M.D., Plaintiff,**

v.

**The REGENTS OF the UNIVERSITY OF COLORADO; The University of Colorado; The University of Colorado University Hospital, a/k/a The University of Colorado Health Sciences Center; University of Colorado Psychiatric Hospital; and Douglas Carter, M.D., Defendants.**

**Civ. A. No. 80–K–1097.**

United States District Court, D. Colorado.

Jan. 14, 1981.

▆▆▆▆▆▆▆▆▆▆▆▆

---

1293

David E. Engdahl, Engdahl & Renzo, Denver, Colo., for plaintiff.

George Dikeou, Denver, Colo., for defendants.

## MEMORANDUM OPINION

KANE, District Judge.

This is an action brought pursuant to the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* and 42 U.S.C. § 1983. Because of the dearth of authority concerning the Rehabilitation Act and with the concurrence of counsel in the instant proceeding, I have elected to write this memorandum opinion as a brief excursion outside the accustomed sphere of precedent.

The plaintiff is a medical doctor who alleges that he was not admitted to the psychiatric residency program offered by the defendants solely on the basis of his handicap. The plaintiff suffers from multiple sclerosis which is medically defined as a disease and legislatively defined as a severe handicap. 29 U.S.C. § 706(13). At the present time the plaintiff is confined to a wheelchair and disabled in his abilities to write and to walk. The processes of multiple sclerosis are insidious and vagarious, but for the purposes of this case it is unnecessary to comment further. As a matter of law, plaintiff is a handicapped individual.

From the testimony taken in discovery and at trial and from the resolution of certain issues of status which are questions of law rather than fact, the following facts were uncontested:

1. The institutional defendants are quasi-autonomous agencies of the State of Col-

orado and are governed by the defendant regents.

2. Defendant Douglas Carter, M.D., is an employee of The Regents of the University of Colorado; is Acting Chairman of the Department of Psychiatry of the other defendants, and is Director of the Psychiatric Residency Program of the other defendants.

3. In order to become eligible to take the examinations for certification in the field of psychiatry by the American Board of Psychiatry and Neurology, Dr. Pushkin must successfully complete three years of accredited residency training in the field of psychiatry.

4. The psychiatric residency program of defendants at all times material to this litigation is a program or activity receiving federal financial assistance. Federal financial assistance pays for instruction and instructional supplies. Federal funds are also used to pay stipends for at least some of the residents in training in the defendants' psychiatric residency program.

5. Dr. Carter encouraged Dr. Pushkin to apply for a position of "Psychiatric Resident, R–II," with knowledge of Dr. Pushkin's handicap of multiple sclerosis.

6. Dr. Carter told Dr. Pushkin that adjustments in defendants' psychiatric residency program could be made to accommodate Dr. Pushkin's handicap, including extending the normal duration of the residency program for him.

7. In the past, defendants had adjusted their psychiatric residency program to accommodate the problems of psychiatric residents with physical difficulties or handicaps, including pregnancy, the amputation of a limb and multiple sclerosis.

8. Dr. Pushkin fulfilled all procedural requirements pertaining to application for the position of "Psychiatric Resident, R–II."

9. By their established policy and custom, the other defendants authorized Dr. Carter to exercise final power of decision as to appointment or rejection of applicants for positions as psychiatric residents, including the position of "Psychiatric Resident, R–II."

10. On or about July 7, 1980, defendants, through Dr. Carter, rejected Dr. Pushkin's application for the position of "Psychiatric Resident, R–II."

11. The act of defendants in rejecting Dr. Pushkin's application was pursuant to official policy.

12. The act of Dr. Carter in rejecting Dr. Pushkin's application was under color of state law, custom or usage.

13. Defendants have excluded Dr. Pushkin from participation in, and denied him the benefit of, the psychiatric residency program.

14. There was space available so that Dr. Pushkin could have been placed in defendant's psychiatric residency training program.

15. At the time of Dr. Carter's deposition, the class of residents in psychiatry into which Dr. Pushkin sought admission was not at capacity and there was no funding limitation which would prohibit Dr. Pushkin's admission to the program.

16. Dr. Carter met with Dr. Pushkin on or about July 7, 1980, in order to discuss the decision not to admit him to the program. The contents of that discussion are in dispute.

17. Shortly after his meeting with Dr. Pushkin on or about July 7, 1980, Dr. Carter had a telephone conversation with plaintiff's wife, Marie Pushkin, in order to discuss the decision concerning Dr. Pushkin's non-admission into the program. The contents of that conversation are in dispute as well.

18. Dr. Pushkin is a physician duly licensed to practice and presently is practicing medicine in the State of Colorado.

19. Dr. Pushkin's physical disease was first diagnosed in 1974 while he was a first year student in medical school.

20. After completing medical school, and while so handicapped, Dr. Pushkin applied for, was accepted into, and successfully completed one year of residency employment and training in psychiatry at the Menninger Foundation in Topeka, Kansas.

From the evidence at trial, which to a slight degree was contested, I find the following:

1. No substantial modification in the residency program would have to be made to enable Dr. Pushkin to participate. Accommodations or adjustments have previously been made for other participants in the same program and could readily be made for him. Adjustments that have been made for other handicapped residents include placing the resident on part-time load and extending the residency term, adjusting patient load, modifying curriculum schedules, reducing night call duty, placing at nearby rather than distant hospitals for duty, allowing wheelchair use, providing convenient office space, and allowing exchange of duty schedules with other residents.

2. The equivalent of 48 months full-time training is required, but need not be accomplished within any fixed period. The fact that an applicant might be able to handle only half-time rather than full-time work assignments is not a factor in selection.

3. The hospital facilities accommodate persons in wheelchairs. Modifications that could be made for Dr. Pushkin were discussed with him by Dr. Carter.

4. The effect of Dr. Pushkin's disability on other residents is not considered a problem. His difficulty in writing is not considered a problem because he can dictate his notes and reports.

5. Dr. Carter was not concerned with possible exacerbation of Dr. Pushkin's handicap.

6. Dr. Pushkin is academically qualified for admission to the residency program. He received his medical training at defendant institutions.

7. Pre-med academic record, medical school academic record and medical college aptitude test scores are not used as a criteria for admission.

8. The principal screening criterion applied is the "Dean's letter." Dr. Pushkin received a positive "Dean's Letter."

9. The essential criterion for admission is the result obtained from personal interviews with faculty members. Each of the four interviewers in Dr. Pushkin's case prepared and submitted to Dr. Carter a document entitled "Report of Interview on Residency Applicant." Each such report contains space for narrative comments, and a "prediction scale" at the bottom.

10. Marks placed on the prediction scale by the interviewers are converted to numerical value by a process applied by someone other than the interviewers. Averaging the numerical values from the scales on the reports of the four interviewers produces a figure called the "interview mean."

11. By interrogatory, Dr. Pushkin requested defendants to:

"2. Please state every reason why the application of Plaintiff for the position of Psychiatric Resident at any Defendant institution was rejected, and every reason why he was not appointed to said position."

Defendants' response to this interrogatory was:

"2. Plaintiff was not admitted into the "Psychiatric Resident, R–II" program because Plaintiff's interview mean ratings, based upon Plaintiff's four interviews with faculty members of the University of Colorado Psychiatric Hospital, was far below the level of any other person accepted into the program."

12. The mean interview ratings, as a general practice, are not necessarily controlling in the selection process. Moreover, with specific reference to Dr. Pushkin, Dr. Carter stated that "the numbers," i. e., the mean interview rating, did not dispose of his application. Dr. Pushkin was never told that his mean interview rating was the reason for his rejection.

13. The narrative contained on each interviewers' report, explains the reasons for the rating on the prediction scale. Each instance shows that the interviewer's rating was inextricably involved with Dr. Pushkin's handicap and by the interviewer's perception of the problems the handicap would create. It is not possible to extricate ratings from the reactions to the handicap itself.

14. Neither Dr. Pushkin nor his wife was ever given a reason for his rejection from the program. Both were left to draw inferences in their separate conversations with Dr. Carter and the fair inference to be drawn by each from the statements made and the absence of other statements being made was that the handicap itself was the reason for the rejection. Indeed, it is somewhat disconcerting to observe that none of the defendants or their surrogates ever discussed with Dr. Pushkin or his wife the question of whether the interviewers were concerned less with the psychological aspects of plaintiff's illness than with the constellation of personality aspects which existed before the onset of the illness. Of course, at trial defendants' testimony focused on this previously existing aspect of character formation.

15. The critical item of concern to defendants was whether Dr. Pushkin could be aware of the reaction to him experienced by his patients and respond appropriately. In a sense, defendants questioned Dr. Pushkin's ability to see himself through the eyes of patients whilst simultaneously recognizing that the view of such patients is often distorted.

16. Dr. Pushkin spent the year July 1, 1978 to June 30, 1979 at the Menninger School of Psychiatry and received a highly favorable recommendation from that institution's director, Normund Wong, M.D. *viz.*, "Doctor Pushkin is a hard-working, thorough, reliable and efficient physician, showing remarkable patience and perserverence (sic) and more than the average understanding for his patients. His supervisors did not feel that his medical illness presented any emotional impairment in his work in the field of psychiatry and felt that he had great potential for a future in psychiatry. He has a pleasing personality, works well with his colleagues and is able to handle the most difficult case in a satisfactory manner. He was an inspiration to his colleagues, to faculty and staff." (Plaintiff's Exhibit 6.)

17. Dr. Pushkin's personal psychiatrist, Dr. Gordon Farley, is a member of the staff of the defendant institutions. He, too, advised defendants that Dr. Pushkin shows exceptional skill and understanding. It is Dr. Farley's belief that Dr. Pushkin will make an unusually good psychiatrist.

18. Defendants are justifiably proud of the excellent psychiatric residency program which they offer. It is one of the few such programs which regularly fills its class quotas and it enjoys a reputation for excellence in the national academic community. According to available information the failure rate is lower than other psychiatric residency programs.

19. The residency program has a significant psychoanalytic component which, I feel compelled to observe, predominates over other aspects of the program. The evidence shows clearly that the psychoanalytic orientation emphasizes the need for residents to have superior ability to relate to patients. While I risk speculating I think it fair to state that my perception of the facts adduced at trial leads me to think that this heavy emphasis lies at the crux of this controversy.

20. The aim of the personal interview process, though not always realized, is to obtain an unbiased consensus. Thus interviewers are discouraged from discussing candidates with other interviewers and from reviewing candidates' files. Bona fide efforts are made to select interviewers at random, but such efforts are hampered by time constraints and the disparate enthusiasms of faculty members for participating in the interviewing process.

21. Interview ratings are scored mechanically by a secretary in order to arrive at a mean interview score. Even so, individual interviewer scores are weighted by Dr. Carter on the basis of an assessment of the interviewer's track record, *i. e.*, some are tough, some are easy. Further weighting is based on the degree of conformity that an individual interviewer's assessment has with others of the same candidate. Dr. Carter has found that if an interviewer expresses profound sentiment not expressed by other interviewers, the probabilities are that the profound sentiment is valid and that the other interviewers simply failed to pick up on something which will be corroborated by later events.

22. All interviewers expressed strong feelings of sadness, concern and admiration for Dr. Pushkin. Some translated this into a desire to help him. Some felt they rated Dr. Pushkin higher because of his condition. Based on an evaluation of all of the interviews, I am satisfied that each was distorted. It is curious to note that while each interviewer quite honestly believes that the distortion resulted in a higher rating than would have been given absent Dr. Pushkin's handicap, the consensus obtained from further evaluation and discussion by a group of interviewers and other faculty was decidedly to Dr. Pushkin's detriment. Among other things, this observation suggests to me that the focal point of the process shifted from consideration of Dr. Pushkin's candidacy to faculty introspection.

23. Other handicapped individuals have been admitted to the residency program including one person afflicted with multiple sclerosis yet that person was not confined to a wheelchair and did not present such disabling symptoms as those presented by Dr. Pushkin.

24. By its very nature the interview process is entirely subjective. The interviewers are looking for such intangibles as ability to relate, to analyze, to evaluate and to stabilize. The process is intuitive. Each interviewer has his own idea of what the subject program is and should be and each interviewer attempts to assess each candidate in terms of that perception.

25. Thirty-five candidates were deemed to be qualified for admission to defendants program. Sixty individuals, including Dr. Pushkin, were considered to be unqualified. According to Exhibit 4 Dr. Pushkin ranked 59 out of the 95 candidates.

The specific statutory provision alleged to have been violated is § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the bene-

fits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

At the outset it is important to note that this case arises under a statute prohibiting discrimination on the basis of handicap in both employment and educational programs. Because most of the case law under § 504 has been on the question of whether there is a private right of action,[1] there is little authority on the standard by which a court must determine if there has been prohibited discrimination.

Most importantly Dr. Pushkin must show that he is an "otherwise qualified handicapped individual" for this particular psychiatric residency program. Here the Supreme Court has been definitive. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the court determined that an applicant to a nurse-training program was not an "otherwise qualified handicapped individual" because her hearing impairment precluded her from being qualified. Deferring to the plain language of the statute the court stated:

[s]ection 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.

*Id.* at 405, 99 S.Ct. at 2366. Giving further credence to the regulations promulgated by HEW for § 504, the court stated that a " '[q]ualified handicapped person' is, '[w]ith respect to postsecondary and vocational services, a handicapped person who meets the academic and technical standards requi-

---

1. Whether there is an implied right of action under § 504 does not pose a problem here as the claim is brought pursuant to § 1983. *Maine v. Thiboutot,* —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

site to admission or participation in the [school's] education program or activity . . . .' 45 C.F.R. § 84.3(k)(3) (1978)." *Id.* at 406, 99 S.Ct. at 2367. "An explanatory note [to this regulation] states: 'The term "technical standards" refers to all nonacademic admissions criteria, [*e. g.*, subjective criteria] that are essential to participation in the program in question.' 45 C.F.R. pt. 84, App. A, p. 405 (1978) (emphasis supplied)." *Id.*

The court put *great emphasis* on HEW's insistence that an "otherwise qualified handicapped individual" is one qualified *with* or *in spite of* his handicap, and not one qualified *notwithstanding* or *except for* his handicap. *Id.* at 405 and n. 7, 99 S.Ct. at 2366 and n. 7. *See* 45 C.F.R. pt. 84, App. A, p. 405 (1978) (giving example that under literal translation of "otherwise qualified handicapped individual" a blind person would be otherwise qualified to drive a bus). The court concluded that a legitimate physical qualification may be essential to participation in particular programs, *Id.* at 407, 99 S.Ct. at 2367. Here, it is conceded that no particular physical qualification is essential to participation in the program. Were it not conceded, I would hold so as a finding of fact. The primary contention of the four interviewing doctors, as first articulated in Dr. Carter's deposition, is that Dr. Pushkin cannot deal emotionally with potential patient-reaction to his disability—a quality of emotional stability necessary for a psychiatrist.

There is no doubt that the visitation of multiple sclerosis on an individual is an exceedingly traumatic event. It is to be presumed that such trauma either causes severe emotional upheaval or precipitates an effusion of psychological symptoms which previously did not interfere with successful functioning. In the instant case as I view it, the threshold question is whether, irrespective of psychogenesis, Dr. Pushkin's alleged psychological impairments preclude him from being qualified. I must digress for a moment to observe that, giving full consideration to patient care, we are still concerned with the qualifications for admission to a training program the object of which is to produce graduates capable of

being certified as qualified psychiatrists. We are not presently concerned with the end product of the residency program. If candidates were already capable of giving competent psychiatric care to patients without supervision or improvement and modification in technique, there would be no point in having the program.

In order to arrive at a fair answer to the threshold question it is first necessary to examine the method used for determining qualifications. Defendants employ exclusively subjective criteria. While I feel confident in opining that if any discipline should be capable of using subjective criteria without ill effect, it should be psychiatry, I must nevertheless observe that the Tenth Circuit Court of Appeals severely criticizes their exclusive use as being vague and impractical. *See Muller v. United States Steel Corp.*, 509 F.2d 923, 928 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). *See also EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir. 1980), *Thornton v. Coffey*, 618 F.2d 686, 691 (10th Cir 1980), *Marshall v. Security Bank & Trust Co.*, 572 F.2d 276, 279 (10th Cir. 1978). In *Dano v. Stetson*, Civ.No. 77–K–1039, Mem.Op. at 8 (D.Colo., April 22, 1980), I observed that subjective criteria "may offer a convenient pretext giving force and effect to [prejudice], perhaps without a conscious effort by the decision maker." *Id. citing Muller, supra*, and *Thornton, supra*. The nonexclusive use of subjective criteria in the educational setting, however, is clearly a permissible means of determining admissibility of students. *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

In the instant case, however, there is no established criteria upon which subjective assessment can be based. From the testimony I glean that there is some sort of inchoate criteria which the interviewers believe they share, but it certainly has not been formulated or articulated. What is clear, however, is that when informing Dr. Pushkin of his rejection, Dr. Carter discussed the rejection only in terms of the handicap and gave no other reason; that

when subsequently discussing the rejection with Dr. Pushkin's wife Dr. Carter again explained the decision only in terms of Dr. Pushkin's handicap; and that the interview reports document assumptions of inability based upon the handicap.

■ I do not believe that defendants acted in bad faith, nor do I consider that good faith constitutes a defense. I hold that plaintiff has established his claim for relief by proving the following:

1. Defendants acted under color of state law.

2. Plaintiff is a handicapped individual.

3. Defendants' activities receive federal financial assistance sufficient to trigger application of the act.

4. Defendants excluded plaintiff from participating and receiving the benefits of the psychiatric residency program.

5. Plaintiff is an otherwise qualified person who is able to meet all of the program's requirements in spite of his handicap.

6. Plaintiff was excluded from the program solely by reason of his handicap.

Dr. Pushkin has sufficiently established through Dr. Carter's deposition and the interview comment sheets that the qualifications for a resident in defendants' program are intelligence, emotional stability and physical stamina. He further showed that the criteria by which one determines qualifications are subjective. Further, he established by his and Dr. Farley's testimony that he is qualified with his handicap. He established his ability to empathize, to avoid over-identification with patients and to deal reasonably with patients' reactions to him as a handicapped person. Finally, he has established to my satisfaction that the sole reason for his exclusion from the program was his handicap. This last conclusion is based on the interview sheets which refer to assumed disabilities occasioned by his multiple sclerosis from which according to his testimony and that of Dr. Farley he does not suffer and additional testimony which shows after-the-fact articulation of concern about his

alleged emotional instability which was not manifested in the interview sheets or in Dr. Carter's conversations with Dr. and Mrs. Pushkin. The assumptions about Dr. Pushkin's inabilities arising from his multiple sclerosis and use of steroids were based on highly subjective reactions which are at least disputed, challenged by competent examination, and most importantly, totally unverified.

It is very difficult for a tyro to second guess psychiatrists about their judgments and by doing so to rule that a handicapped person is in fact qualified when they say he is not, but such is the office of § 504. I do not wish to be hypercritical of the defendants. In truth, I am most favorably impressed by the effort and dedication which the defendants demonstrate. I am not even critical of the psychiatric resident selection process as it is generally applied. I am mindful of the excellent reputation which defendants' program enjoys. Nevertheless, in this instance, I am convinced that the established processes failed. Testimony establishes that Dr. Pushkin is indeed qualified by defendants' standards. I believe that defendants failed to reach this conclusion because they did not apply their established standards. Such a failure is not uncommon where only subjective criteria are used to select a few from an applicant group of many. I will not venture even a guess of whether Dr. Pushkin is or should be among the best qualified, but I hold that he did not receive the same consideration and that he was indeed treated differently because of his handicap. Such, I believe, is the essence of that sort of discrimination which the statute prohibits.

■ I find that Dr. Pushkin has not met his burden of proof concerning monetary damages and hence award none. Since Dr. Pushkin is the prevailing party he is entitled to an award of costs including attorney fees. Even mindful of the admonitions contained in *Gurule v. Wilson*, 635 F.2d 782 (10th Cir. 1980), and applying the twelve criteria set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714

(5th Cir. 1974) I would award attorney fees in excess of the amount claimed. However, plaintiff entered into a fee agreement which is fair and reasonable. He agreed to pay his attorney at the rate of $60 per hour. That amount is below the current market, but it is not so low as to be unconscionable or parsimonious. The hours spent by plaintiff's counsel total 121 and I find that such expenditure of time was prudent and reasonable. Accordingly, plaintiff shall recover an award for attorney fees in the amount of $7,260. Plaintiff shall recover allowable costs in accordance with our local rules of court if he files a bill of costs as required therein. It is

ORDERED that an injunction shall issue directing defendants to admit plaintiff to the next ensuing class in the subject psychiatric residency program at the R–II level. It is further

ORDERED that plaintiff shall have judgment for his attorney fees in the amount of Seven Thousand Two Hundred and Sixty Dollars ($7,260.00) and for his allowable costs herein expended.