**CITY CONSUMER SERVICES, INC., Plaintiff,**

v.

**David G. and Kathryn B. HORNE, Defendants.**

**Weldon S. ABBOTT, et al., Plaintiffs,**

v.

**Carvel R. SHAFFER, et al., Defendants.**

**Victor W. ARMITAGE, et al., Plaintiffs,**

v.

**HOME SAVINGS & LOAN, a corporation, and Carvel R. Shaffer, Defendants.**

Civ. A. Nos. C82–0235K, C82–0628K and C82–0670K.

United States District Court, D. Utah, C.D.

March 19, 1986.

Arthur H. Nielson, Gary A. Weston, Earl J. Peck and John K. Mangum, Jr., of Nielson & Senior, Salt Lake City, Utah, for plaintiffs.

Thomas A. Quinn, Kent H. Murdock and Anthony B. Quinn, of Ray, Quinney & Nebeker, Salt Lake City, Utah, for defendants.

## ORDER AWARDING ATTORNEY FEES

KANE, District Judge.

The Abbott and Armitage plaintiffs in this action have moved the court for an award of costs and attorney fees in the amount of $509,303.05.[1]

This action arose from the fraudulent business activities of three Afco corporations and their president, Grant Affleck, who ran an investment scheme in Salt Lake City, Utah. Investors were beguiled into taking out second mortgages on their

---

1. Plaintiffs' original application for fees requested $506,373.00. Appropriately, plaintiffs have reduced their request by $4,807.95, the amount claimed as their pro-rata share of the fees and costs incurred in the bankruptcy suits, to $501,- 565.05. In a supplemental affidavit of Gary Weston, plaintiffs request an additional $5,202.00, and in a supplemental affidavit of John Mangum, another $2,536.00. Thus, the request before me now is for $509,303.05.

homes in order to purchase worthless securities from Afco and Affleck. Afco promised the investors that the promissory notes they executed in favor of the various lenders would be secured by Afco property, that Afco would make the monthly payments to the lenders on behalf of the investors, and that the investors would receive approximately a 10% annual return on their investments. When Afco filed for bankruptcy, hundreds of investors were left to answer demands for payment on their second mortgages. Various foreclosure proceedings were commenced against investors, and several groups of investors in turn initiated actions against the lenders. Two of these investor actions, *Abbott v. Schaffer*, C82–0628A, and *Armitage v. Home Savings*, C82–0670, were initiated in 1982 against Home Savings & Loan, and consolidated for trial under the *Abbott v. Shaffer* caption.

I then severed for trial the claims of 71 of the Abbott and Armitage plaintiffs against one lender, Home Savings. A jury trial began on July 2, 1984. On Aug. 7, 1984, after listening to the evidence, I granted defendant's motions for directed verdicts on several claims.[2] I denied defendant's motions for directed verdicts on the remaining claims. On Aug. 14, 1984, the jury returned its special verdicts finding that Home Savings had violated (1) section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), (2) section 61–1–22(1)(b) of the Utah Uniform Securities Act, and (3)

section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. The jury also found that Home Savings had violated the truth in lending provisions of the federal and state lending laws, 15 U.S.C. § 1635 and Utah Code Ann. § 70B–5–204 (as in effect from November, 1981, through July, 1982), and specified the amount of property each plaintiff would have to return to Home Savings in order to complete rescission. Lastly, the jury found that Home Savings had committed common law fraud upon the Abbott plaintiffs.

### A. *Basis for award*

The federal and state truth in lending statutes and the Utah securities statute provide for an award of attorney fees to the prevailing plaintiff. Thus, a statutory basis for an award of fees exists.

The federal truth in lending provisions provide that any creditor who fails to comply with its statutory requirements with respect to any person, is liable to that person for damages and,

> in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

15 U.S.C. § 1640(a)(3). Section 70B–5–203(1)(c), Utah Code Ann. (1953) contains a

---

**2.** I granted motions of Defendant Home Savings for a directed verdict on the following claims:

(a) claims under section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1);

(b) claims under section 17 of the Securities Act of 1933, 15 U.S.C. § 77*o* ;

(c) claims under the Federal Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*

(d) claims under the Utah Racketeering Influences and Criminal Enterprises Act (RICE), Utah Code Ann. §§ 76–10–1601 *et seq.;*

(e) claims under the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13–11–1, *et seq.;*

(f) claims that Home Savings had a duty to plaintiffs as sureties which it breached;

(g) claims that Home Savings was guilty of negligently misrepresenting material facts;

(h) claims that Home Savings was guilty of constructive fraud upon plaintiffs;

(i) claims that Home Savings was negligent in its conduct towards plaintiffs;

(j) claims that Home Savings had a fiduciary duty to plaintiffs which it breached;

(k) claims against Home Savings arising under the Utah Savings and Loan Association Act, Utah Code Ann. § 7–7–33(4).

I later ruled that Home Savings was not guilty of violating the unconscionability provisions of the Utah Consumer Credit Code, Utah Code Ann. § 70B–5–108, and dismissed Home Savings counterclaims for foreclosure of trust deeds on plaintiffs' property. *See Order*, December 20, 1985.

parallel provision to the federal statute, but the statute adds that recovery under § 130(a) of the Federal Truth in Lending Act, 15 U.S.C. § 1640(a), "shall preclude recovery under subsection (1) of this section for actions which violate both the Federal Truth in Lending Act or the Federal Fair Credit Billing Act and the Utah Uniform Consumer Credit Code." § 70B–5–203(2). Thus, plaintiffs are clearly entitled to an award under the federal truth in lending statute, but not under the Utah Uniform Consumer Code as well.

Additionally, section 61–1–22(1)(b), Utah Code Annotated, 1953, as amended, provides for an award of attorney fees against any person who

> ■ffers, sells, or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

These two statutes spell out the threshold requirements for determining when a person is entitled to an award of attorney fees. The federal truth in lending statute permits recovery in "any successful action" or "in any action in which a person is determined to have a right of rescission." Clearly plaintiffs have met these threshold requirements and are entitled to an award of fees. The difficult task, however, is determining the extent and reasonableness of the award.

Defendant suggests that, and I must decide whether, the amount requested should be reduced for some or all of the following reasons:

(1) *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), requires reduction if plaintiff failed to prevail on claims unrelated to those he succeeded on. *Hensley v. Eckerhart* also requires an examination of the overall level of success in determining the amount of the award;

(2) Utah law limits the award under the Utah securities statute to time spent prosecuting that claim;

(3) The fee agreement between plaintiffs and counsel should limit the award;

(4) The factors for reasonableness set forth in *Hensley v. Eckerhart* and *Ramos v. Lamm*, 713 F.2d. 546 (10th Cir.1983), require reductions.

I preface my discussion of these points by noting that I am applying the analysis set forth in *Hensley* and *Ramos*. *Hensley*, of course, arises under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, and each of the claims initially raised would have entitled a prevailing plaintiff to recover attorney fees, whereas in this case, only two claims on which plaintiffs prevailed were based on statutes which provided for recovery of fees. Nonetheless, many courts have accepted that *Hensley* applies to all cases arising under federal fee shifting statutes, *see, e.g., United Slate, Tile and Composition Roofers v. G & M Roofing and Sheet Metal Co., Inc.*, 732 F.2d 495 (6th Cir.1984), and I rely on the Supreme Court's analysis in *Hensley* to a great extent.

I turn now to examine each of defendant's arguments for reduction of the award.

### 1. *Successful and unsuccessful claims*

Once a court has determined that the plaintiff is entitled to an award of fees, it is important to examine the "results obtained" to determine whether to adjust the fee downward or upward. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940. This involves a two-part analysis. First, did the plaintiff fail to prevail on claims that are unrelated to claims on which he succeeded? Second, did the plaintiff achieve a level of success so that the hours reasonably expended form a satisfactory basis for making the award? *Id.*

In the concluding language of *Hensley*, the Supreme Court summarized the importance of examining the results obtained:

> We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney fees under 42 U.S.C. § 1988. Where a plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. at 1943 (emphasis added). A more general formulation is that plaintiffs' counsel are entitled to an "award of fees for all time reasonably expended in pursuit of the ultimate result achieved." *Hensley v. Eckerhart*, 461 U.S. 424, 431, 103 S.Ct. 1933, 1938, 76 L.Ed.2d 40 (1983) (quoting *Davis v. County of Los Angeles*, 8 EPD ¶ 9444 (C.D.Cal.1974), at 5049). *See also Ramos v. Lamm*, 713 F.2d 546, 556 (10th Cir.1983) ("The hard cases will be those in which the court must determine whether 'excellent results' were achieved even though some interrelated theories urged by the plaintiff were unsuccessful or whether reductions in fees are required because the plaintiff's successes were only 'partial or limited.' ").

Defendant, in opposing plaintiffs' application, argues that plaintiffs should recover only for work performed on the two issues on which it prevailed and for which a statutory basis for an award exists. Alternatively, defendant would have me reduce the award to time spent only on the five claims on which plaintiff prevailed.

In the Home Savings litigation, the work on unsuccessful claims generally is not separable from work on successful claims. The only entries which Nielsen & Senior broke down according to time spent on distinct claims were entries describing time spent preparing jury instructions and the trial brief. By examining the invoices, it might be possible for me to determine what portion of those 600 some odd hours were spent on losing claims, and subtract those hours from the total.

For the most part, however, the work was not susceptible to breakdown. If the claims for relief were distinctly different, "based on different facts *and* legal theories," *Hensley*, 461 U.S. at 434–35, 103 S.Ct. at 1940 (emphasis added), a reduction would be required. But to require counsel to keep track of which portion of a deposition was related to the RICO claims and which portion was related to the constructive fraud claim would be unnecessary and impossible. As the Supreme Court also noted:

> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435, 103 S.Ct. at 1940.

Defendant argues that the facts set forth to prove violations of the requirements of the truth in lending acts are distinct from those set forth to prove fraud or securities law violations. I cannot find, however, that the evidence needed to prove that Home Savings violated the truth in lending provisions was so distinct from the evidence needed to prove that it had committed common law fraud upon the plaintiffs, that counsel or I should be expected to divide the hours expended on a claim-by-claim basis. Most of counsel's time was "devoted generally to the litigation as a whole." *Id.* As the Tenth Circuit ex-

plained in *Ramos*, "the question before us is whether the plaintiffs acted reasonably under the circumstances facing them and whether they achieved 'excellent results' on what were clearly nonfrivolous, interrelated theories based upon a common core of facts." 713 F.2d at 556. Every one of plaintiffs' claims, successful and unsuccessful, arose from the same transactions between Home Savings and the plaintiffs. Only the time spent on jury instructions and preparing the trial brief is susceptible to reduction by severing time spent on successful claims from time spent on unsuccessful claims. Even there, though, I am not required to reduce the time because the claims were not "based on different facts *and* different theories."

If I determine that the award should be reduced, I then may choose how to make such a reduction. I may either "attempt to identify specific hours that should be eliminated," or "simply reduce the award to account for the limited success." *Id.*, 461 U.S. at 436–37, 103 S.Ct. at 1941. The burden, of course, is on the applicant to document hours and rates, and to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Id.* at 437, 103 S.Ct. at 1941. If the work on successful and unsuccessful claims is inseparable, I may reduce the award in proportion to the overall success. If the work spent on successful claims can be severed from time spent on unsuccessful claims, I must reduce the compensation by the hours spent on the unsuccessful claims.[3]

In this case, the lawsuit generally consisted of related claims, and I do not think plaintiffs should have their attorney fees reduced simply because they did not prevail on each claim for relief. *See Hens-*

*ley*, 461 U.S. at 440, 103 S.Ct. at 1943. The work generally was not susceptible to breakdown by claims. In areas in which the work was able to be broken down, for example, in trial preparation, I have reduced the award accordingly.

The second part of the *Hensley* analysis, and especially important in cases where the plaintiff does not prevail on all claims for relief *and* the claims involve a common core of facts or are based on related legal theories, directs that I ask whether the plaintiff achieved a level of success so that the hours reasonably expended form a satisfactory basis for making the award. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40.

Plaintiffs succeeded on many significant issues in this lawsuit by proving fraud, securities violations and violations of the truth in lending laws. It is well established that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not sufficient ground for reducing a fee. The result is what matters." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. In this case, the results achieved were far reaching, as explained in my Dec. 20, 1985, final order in this case. Although I granted directed verdicts on several claims before sending the case to the jury, the relief requested on those counts was virtually the same as that requested on the five counts which went to the jury and on which plaintiffs prevailed. Plaintiffs sought an order rescinding the transactions with Home Savings, and invalidating the securities purchased. The essential relief requested was obtained. The fact that plaintiffs did not obtain treble damages by proving RICO violations, or additional penalties for unconscionability, does not indicate a lack of overall success

---

3. The Supreme Court in *Hensley* specifically rejected, however, as I do today, the mathematical approach which compares the total number of issues in the case with those actually prevailed upon. *Id.*, 461 U.S. at 435, n. 11, 103 S.Ct. at 1940, n. 11. Several other warnings appear in *Hensley*. The Court points out that the fact that plaintiff prevailed may tell us nothing about the reasonableness of the expenditure of counsel's

time, and that if a plaintiff achieved only limited success, then multiplying hours by rate may result in an excessive award, even in cases where the claims were related. Further, even if plaintiff has achieved significant relief, a reduced award may be appropriate in view of the scope of the litigation as a whole. *Id.* at 440, 103 S.Ct. at 1943.

in bringing the action. Thus, I will not reduce the award based on the level of success achieved, since I think that the level of success was quite significant and justifies a significant award of fees.

### 2. *State law as a limit on the award*

Defendant argues that recovery of fees pursuant to the state securities law claim is limited to the time reasonably spent prosecuting only that claim. It cites *Stubbs v. Hemmert*, 567 P.2d 168 (Utah 1977), and *Utah Farm Production Credit Ass'n v. Cox*, 627 P.2d 62 (Utah 1981), for the proposition that "[a] party is therefore entitled only to those fees resulting from its principal cause of action for which there is a contractual (or statutory) obligation for attorney's fees." *Cox*, 627 P.2d at 66.

These two cases do not provide any more stringent guidelines than those set forth in *Hensley* and discussed above. In *Stubbs*, a plaintiff brought an action of foreclosure on a promissory note and the defendant counterclaimed for damages for plaintiff's wrongful removal of equipment from the building. The court awarded plaintiff attorney fees incurred in the foreclosure action, but denied fees incurred defending against the counterclaim, noting (1) that plaintiff was not successful in defending the counterclaim and (2) that the counterclaim did not relate to the collection of the note or the foreclosure of the property. *Id.* at 171. Similarly, *Cox* involved a complaint on debt owed and a counterclaim, and the primary focus of the trial was the counterclaim. The court found no way to distinguish the time spent prosecuting the complaint from the time spent defending against the counterclaim. 627 P.2d at 66. The reasoning of these cases is incorporated in the *Hensley* requirement that I examine the "results obtained."

Further, in *Young v. Taylor*, 466 F.2d 1329 (10th Cir.1972), a suit was brought under § 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 of the Securities and Exchange Commission, the Utah Blue Sky Law, Utah Code Ann. § 61–1–22(1)(b) (1953), and common law fraud principles (four out of the five claims that went to the jury in the case before us). The Tenth Circuit did not address whether it should have denied fees for work done on the fraud claims or other claims that did not have a statutory basis for an award. The Circuit stated: "As discussed above, the Utah Blue Sky statutes also authorize the award of attorney fees." *Id.* at 1338. Thus, there is no law in support of defendant's argument that Utah law itself limits the award in this manner. Once again, we are back to the basic standards set forth in *Hensley*.

### 3. *Fee arrangement as a limitation on the award*

Plaintiffs are contractually bound by a retainer agreement, in which plaintiffs agree to pay attorneys the actual amount of their standard billings for the time expended on behalf of the entire plaintiff group. They are also bound by a pledge agreement, in which each plaintiff agreed to continue making his or her periodic payments until (a) litigation is concluded (b) plaintiffs are released; or (c) two years have passed since plaintiff gave written notice of his intent to abandon the plaintiff group.

Under these agreements, all 600 plaintiffs are bound as a group to pay all fees incurred by Nielsen & Senior in this litigation. The way in which the group meets its obligation to pay Nielsen & Senior is to charge each plaintiff his pro rata share of the bill each month.

Defendant argues that I must consider these agreements in making the award for fees, and suggests that I award plaintiffs an amount equal to their pro-rata share of the total attorney fees incurred by the entire client group to date. The fees to date total $1,500,022.70. Home plaintiffs comprise 12.6% of the Abbott plaintiffs. Therefore, defendant argues, plaintiffs should recover 12.6% of the total, or $189,002.86. This amount is significantly less than the $509,303.05 requested by plaintiffs.

In support of its argument that plaintiffs' fee agreement serve as a limit to the award, defendant cites my opinion, *Pushkin v. Regents of University of Colorado*, 504 F.Supp. 1292 (D.Colo.1981). *Pushkin* involved a section 1983 (42 U.S.C. § 1983) action brought by a physician who was denied admission to the psychiatric residency program of the University of Colorado solely on the basis of a handicap. I found that Dr. Pushkin was the prevailing party and entitled to an award of costs including attorney fees. *Id.* at 1299. Plaintiff requested an award of fees calculated at the rate of $60 per hour for 121 hours, the rate he had contracted to pay his attorney. I granted plaintiffs' request even though I found it was below the current market rate because the rate was not unconscionable, and there was no compelling reason for me to grant more than his request or the fee agreement.

In this case, defendant argues that I am bound by *Pushkin* not to fashion an award that exceeds what these 71 plaintiffs are bound to pay their attorneys under the fee agreements. Defendant's argument must fail. In *Pushkin* there was no conflict between the amount requested in the application for fees and the fee agreement. The real issue addressed in *Pushkin* was whether $60 per hour was reasonable, not whether I was bound by the fee agreement. Moreover, the plaintiffs in this case *are bound* to pay the attorneys whatever is billed. The fact that there is an agreement among plaintiffs requiring each to pay a pro rata share of the total does not release the plaintiff group as a whole from paying the entirety of the attorney's fees.

Additionally, since I authored the *Pushkin* opinion, the Tenth Circuit has specifically "hesitate[d] to impose a fee ceiling," *Cooper v. Singer*, 719 F.2d 1496, 1503 (10th Cir.1983), in a section 1983 suit requesting fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Noting that courts have the power to exercise supervision over the attorney-client relationship, and that fees are central to that relationship, the court noted:

The issue then is not whether we can restrict a client's fee obligation in light of the apparent congressional intent of section 1988; rather, the issue is whether we should.

*Id.* at 1504–05. The court relied on the existence of rules and regulations of the bar, which place on the lawyers a responsibility to take into consideration "the availability of statutory fee award provisions in determining their fee arrangements with clients," *id.* at 1506, as support for its expectation that lawyers would draft agreements eliminating conflicts between section 1988 fee awards and client fee obligations, and thus "avoid the need for courts to step in and rectify conflicts on an individual basis." *Id.*

In *Cooper*, though, the court felt there was a conflict. It concluded that if the § 1988 award was less than the amount owed to the attorney under the fee arrangement, the lawyer would have to reduce his fee, but if the fee award was greater than the amount owed under the contingent fee agreement, the attorney was entitled to the full amount of the award. *Id.* at 1506–07.

In summary, we conclude that a prevailing plaintiff's section 1988 fee award should be calculated within the framework set forth by *Hensley v. Eckerhart*, [461] U.S. [424], 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and further explained in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983). In accordance with these cases, the existence of a contingent fee agreement between the plaintiff and his attorney shall neither prohibit the fee award nor limit its amount. We also conclude that the section 1988 fee award would fulfill the plaintiff's fee obligations. In the present case, the fee award determined by the district court will satisfy the client's fee obligations.

*Id.* at 1507. *See also United Slate, Tile and Composition Roofers v. G & M Roofing and Sheet Metal Co., Inc.*, 732 F.2d 495 (6th Cir.1984).

■ The Tenth Circuit did not preclude the courts from looking to the attorney

client fee arrangement as "relevant, but non-conclusive, evidence of the value of the lawyer's services." I have determined that I have the authority to determine whether and how much attorney fees will be awarded in this case. I am not bound by agreements between the parties though I have considered them.

### 4. *Hours and reasonableness of the award*

Plaintiffs set forth four factors in favor of their request for attorney fees:

1) the preparation for trial took substantial time;

2) the questions were novel and difficult, requiring (a) extra effort to develop and (b) extra skill to produce sound legal positions;

3) the fees are not disproportionate; and,

4) there was a strong undesirability factor to be considered (the plaintiffs' attorneys took an unpopular stand, taking the side against nearly every major lending institution in Salt Lake City).

I have spent several hours reviewing plaintiffs' application, the affidavits submitted, a good portion of Nielsen & Senior's invoices, and defendant's opposition to the award of fees. Plaintiffs have done a superb job in breaking down the fees so that I can examine where time was spent and how it was billed. I find that the records kept were detailed, although most matters were billed to the case as a whole and had to be broken down later to determine which matters were related specifically to the trial of these 71 plaintiffs against Home Savings. I find that hourly rates billed were well within the norm for law firms in Salt Lake City during 1982–1984. Generally, the records kept were excellent, and enable me to fashion an award without requesting any further information from plaintiffs.

Below is the summary schedule submitted by plaintiffs which itemizes the portion of fees and costs incurred to date by Nielsen & Senior for which plaintiffs seek an award against Home Savings. Reference to it will facilitate an understanding of my comments which follow.

### SUMMARY SCHEDULE

| SERVICES | FEES | | | |
|---|---|---|---|---|
| | Home | General | Bankrupcty | Other |
| Complaint | | $ 31,906.00 | | |
| Answers | 751.50 | 2,348.00 | 0 | 4,954.00 |
| Reply/Counterclaim | 862.50 | 108.00 | 0 | 6,271.50 |
| Interrogatories | 59,554.00 | 6,230.50 | 0 | 135,261.50 |
| Depositions | 33,106.00 | 40,976.50 | 0 | 135,845.50 |
| Research | 4,989.50 | 26,599.50 | 3,673.50 | 10,503.00 |
| Motions | 13,627.50 | 15,831.00 | 20,371.50 | 84,098.50 |
| Interviews | 11,104.00 | 36,812.00 | 1,047.00 | 58,995.00 |
| Conference/opposing counsel | 1,292.00 | 342.50 | 98.00 | 18,112.50 |
| Discovery document review | 568.50 | 36,754.00 | 0 | 0 |
| Trial | 92,391.50 | 0 | 0 | 0 |
| Trial preparation | 197,270.00 | 1,189.00 | 0 | 3,058.00 |
| Miscellaneous | 7,412.50 | 64,338.00 | 12,968.50 | 124,469.00 |
| AFCO paralegals | 9,579.50 | 16,363.90 | 0 | 0 |
| Computation of attorney fees | 17,073.00 | 0 | 0 | 0 |
| TOTAL FEES | $449,582.00 | $279,798.90 | $38,158.50 | $581,568.50 |
| COSTS | $ 21,810.62 | $ 21,077.64 | 0 | $115,764.57 |
| TOTAL | $471,392.62 | $300,876.54 | $38,158.50 | $697,333.07 |

SUMMARY SCHEDULE

| SERVICES | FEES | | | |
|---|---|---|---|---|
| | Home | General | Bankrupcty | Other |
| Amount claimed against Home | $471,392.62 (100%) | $ 37,910.44 (12.6%) | 0* | 0 |
| TOTAL CLAIM: | $509,303.05 | | | |

\* Plaintiffs originally claimed 12.6% of the bankruptcy fees, or $4,807.95, in their fee request. They later dropped that portion of the request.

Plaintiffs' summary breaks down time billed into four categories. The Home category consists of fees billed which are directly attributable to plaintiffs' defense of the claims made against them by Home Savings. Plaintiffs admit that a portion, but do not specify how much, of these fees and costs were incurred in the Utah state court cases.

The General category includes fees and costs generated in this action which were beneficial to the entire membership of the Nielsen & Senior client group. Plaintiffs seek an award against Home Savings of 12.6% of the total fees in this category.

The Bankruptcy category includes fees and costs rendered in the United States Bankruptcy Court for the District of Utah in Chapter 11 proceedings of AFCO and Affleck. Plaintiffs have withdrawn their request for an award of 12.6% of these costs and fees.

The other category includes fees and costs primarily related to claims being prosecuted against plaintiffs by lending institutions other than Home Savings. Plaintiffs make no claim for an award of fees in this category.

I have decided not to allow recovery of fees in this general category because the benefit to the group as a whole is the only certain result, and the portion directly beneficial to plaintiffs herein is uncertain.

Lastly, with regard to the fees attributable directly to plaintiffs' defense of the claims made against them by Home Savings, including some defense in state district courts, I must proceed step by step through plaintiffs' application.

(a) *Time*

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 103 S.Ct. at 1939; *Ramos v. Lamm*, 713 F.2d at 552 (10th Cir.1983). I must examine plaintiff's application to make sure counsel has made a "good-faith effort to exclude from [the] fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40.

First, I am disallowing the $751.50 requested in the "answers" category, as these were answers filed in the state court proceedings, not in this proceeding.

Second, I have examined carefully the time spent on depositions, bearing in mind that two attorneys per deposition is usually unnecessary. I found virtually no cases where two attorneys attended the same deposition (except those pointed out by defendant in its opposition brief). The total time spent on depositions was 421.9 hours. In light of the fact that 71 plaintiffs had to be prepared for deposition and represented at deposition, this time appears reasonable.

Third, plaintiffs were billed for approximately 927 hours of trial time. The trial lasted from July 2, 1984, through August 14, 1984, or approximately 32 business days. Dividing 927 hours by 32, the number of days in trial (this method leaves out weekends, and it is likely that some trial preparation took place on the weekends during the trial), plaintiffs were billed an average of 29 billable hours per day. In light of the number of plaintiffs represented by Nielsen & Senior, and the backup work that had to be performed in addition to actual attorney trial time, I find this

number of hours per day high, but not unreasonable. I also find reasonable that three or four lawyers per day were involved in actual trial. Thus, I am not reducing the time in this category.

Fourth, approximately 2,582 hours were spent in trial preparation. Although generally I found no duplication of effort in the manner in which Nielsen & Senior conducted this litigation, I note several probable inefficiencies in the assignment of work in this category. Most of these relate to times in which "Manhattan project" type efforts were undertaken. A notable exception occurred, however, when 12 persons worked a total of 127.5 hours reviewing voir dire questionnaires on the first day of the trial. Although at first glance this looks high, this in fact was a tremendous savings in that jury selection was completed in one day by using an innovative method. The usual method of jury selection would have taken over a week. The time, therefore, was eminently reasonable.

One example of inefficiency occurred at the peak of trial preparation. A total of 633 hours were spent on the brief and jury instructions (210.7 hours on jury instructions, and 422.8 hours on jury instructions and the trial brief). While the issues were complex, some of this time may have been incurred because of the way the assignments were made. For example, *12 attorneys* worked on the jury instructions and approximately that number worked on the trial brief. The work was split up among many associates according to the claims for relief, and each associate performed a great deal of research on each issue. Thus, the work seems to have been spread a little thin, requiring more familiarizing with the facts of the case, more preliminary research, many conferences to discuss progress on jury instructions and the trial brief, and more coordination by senior associates and partners than may have been reasonable.

Another example of possible inefficiency is the 198 hours spent choosing exhibits in May, 1984. I must take into account the fact that the paralegal and supervising attorney had to go through all the client files in order to pick exhibits. But the 198 hours does not even include the hours spent specifically on preparing handwriting exhibits and includes only the time spent in one month, May of 1984. The almost 200 hours spent choosing exhibits is excessive and it will be reduced.

It would be futile go through each entry regarding jury instructions and trial brief work to delete the work on "unsuccessful claims." For example, G. Weston's entry on 6/13/84 reads "preparation of jury instructions on fraud and constructive fraud." Defendant was granted a directed verdict on the constructive fraud charge, and plaintiffs prevailed at trial on the fraud charge. Although the attorney's entry was descriptive of his time, it does not enable me to segregate time spent on successful and unsuccessful claims. Therefore, I am reducing the total hours in this category (trial preparation) to reflect my judgment that too much time was billed in this category. I am reducing the hours from 2,582 by 300 hours for excess time spent on choosing exhibits, and preparing jury instructions and the trial brief. I am reducing that 2,282 hours by 5% to take into account the overall problems with efficiency in this area to 2,168 hours. Since the average rate charged for work in this category, by my calculations, was $76 per hour, I will leave that rate intact and award $164,768.00 for fees incurred in trial preparation.

A total of $9,335 was requested for computation of attorney fees. Plaintiffs later supplemented their request by affidavit, so that the total amount now requested is $17,073. I think record keeping should have been and could have been set up earlier in this case so as to prevent the laborious (although thorough) task of breaking it down into categories for purposes of this application. However, I also know that when work on this case began, I had not severed these claims for trial, and the Tenth Circuit's opinion in *Ramos* had not been issued. Thus, some of the initial $9,335 requested would have been required

to cure these problems during the beginning of litigation. I will allow one-quarter of that time, 52.9 hours, to be compensated at $2,333.00. I will also allow compensation for the 133.5 hours covered in the affidavits submitted by J. Mangum and G. Weston for time spent preparing the application. There were some complex issues involved in resolving the fee issue itself and plaintiffs' counsel should be awarded the $7,338 for that time. Thus, I have adjusted the fees category to allow compensation for a total of 186.4 hours, at $9,671.00.

Defendant raises another objection to the reasonableness of plaintiffs' fee request. Defendant charges that the attorneys' invoices demonstrate numerous examples of excessive billable hours. Defendants provide the court with 850 billing entries in which members of the Nielsen & Senior firm billed over 6 hours per day to plaintiffs. These hours exceed the six-seven hour norm set forth in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), amounting to well over 1600 hours. *Ramos* requires that I "question reported time significantly in excess of the norm." *Id.* at 554. I have done so. While some of the excess time was probably reasonable, for example, during trial and immediately preceding trial, these billing entries occurred throughout the two years covered by the attorney fee application. I must take into account the extraordinary number of entries in excess of the norm. The total hours billed which were in excess of the norm amounted to 1600, which is slightly more than ¼ of the total hours claimed in plaintiffs' request for fees in connection with the Home Savings trial.

■ As plaintiffs point out, at least 330 of the 850 entries occurred during or in the two months preceding trial. Further, I note that approximately 250 of the entries were made by J. Mangum, the associate with the responsibility of coordinating most of the work done in connection with the Home Savings trial. It is not unusual that he would put in very long hours on the case. Overall, however, I find that plaintiffs' attorneys' hours were consistently higher than the norm set forth in *Ramos,* and I am reducing the award overall by a factor of 10% to account for the high billable hours throughout this litigation.

■ The question of an award of costs is difficult to address. Most of the costs sought in plaintiffs' application for fees were costs incurred in making deposition summaries. Plaintiffs request $21,810.62 in this category. The general rule in the Tenth Circuit is that deposition costs are not compensable unless the court finds that the "depositions taken and the copies made of those depositions were reasonably necessary to the prosecution of the action." *Ramos,* 713 F.2d at 560. I have determined in this case that the deposition summaries were reasonably necessary and grant that cost.

(b) *Hourly rates*

■ I have no difficulty with any of the rates charged by Nielsen & Senior attorneys. According to my calculations, the overall rates for work done were fairly low. The only exception is the average rate during trial, which is understandably higher since the most skilled attorneys needed to be present at trial. The following chart demonstrates the reasonableness of the average hourly rates charged by the attorneys.

| Category of work | Total Hours | Total Fees Billed | Average Hourly rate |
|---|---|---|---|
| Complaint Answers | 15.1 | $ 751.50 | $49 |
| Reply to CC | 11.1 | 862.50 | 77 |
| Interrogatories | 897.7 | 59,554.00 | 66 |
| Depositions | 421.9 | 33,106.00 | 78 |
| Research | 78.6 | 4,989.50 | 63 |
| Motions, etc. | 214.1 | 13,672.50 | 64 |

| Category of work | Total Hours | Total Fees Billed | Average Hourly rate |
|---|---|---|---|
| Interviews | 151.8 | 11,104.00 | 73 |
| Conferences | 19.9 | 1,292.00 | 65 |
| Miscellaneous | 170.1 | 7,458.00 | 44 |
| Afco | NA | 9,579.50 | NA |
| Discovery | 12 | 568.50 | 47 |
| Trial | 937 | 92,391.50 | 98 |
| Trial preparation | 2,582.7 | 197,365.50 | 76 |
| Attorney fees | 348.3 | 17,073 | 49 |
| TOTAL HOURS | 5,860.3 | 449,768.50 | 76 |

*Ramos* requires that I establish, "from [my] own analysis of the level of performance and skills of each lawyer whose work is to be compensated, a billing rate for each lawyer based upon the norm for comparable private firm lawyers in the area in which the court sits calculated as of the time the court awards fees." *Ramos*, 713 F.2d at 555. I am satisfied that the overall rates charged were average for 1982–1984. Thus, I make no adjustment to rates billed to plaintiffs by Nielsen & Senior.

I turn now to the actual award. I have summarized the amounts requested and the amounts awarded as follows:

| Category of work | Total Hours Requested | Total Hours Granted | Amount Requested | Amount Granted |
|---|---|---|---|---|
| Complaint Answers | 15.1 | | $ 751.50 | $ |
| Reply to CC | 11.1 | | 862.50 | 862.50 |
| Interrogatories | 897.7 | 897.7 | 59,554.00 | 59,554.00 |
| Depositions | 421.9 | 421.9 | 33,106.00 | 33,106.00 |
| Research | 78.6 | 78.6 | 4,989.50 | 4,989.50 |
| Motions, etc. | 214.1 | 214.1 | 13,672.50 | 13,672.50 |
| Interviews | 151.8 | 151.8 | 11,104.00 | 11,104.00 |
| Conferences | 19.9 | 19.9 | 1,292.00 | 1,292.00 |
| Miscellaneous | 170.1 | 170.1 | 7,458.00 | 7,458.00 |
| Afco paralegals | NA | | 9,579.50 | |
| Discovery | 12 | 12 | 568.50 | 568.50 |
| Trial | 937 | 937 | 92,391.50 | 92,381.50 |
| Trial preparation | 2,582.7 | 2,168 | 197,365.50 | 164,768.00 |
| Attorney fees | 348.3 | 186.4 | 17,073.00 | 9,671.00 |
| TOTAL HOURS | 5,860.3 | | 449,768.50 | 399,427.00 |
| Reduced by 10% | | | | 359,484.00 |
| Plus costs | | | 21,810.62 | 21,810.62 |
| AMOUNT OF AWARD | | | | $381,294.62 |

It is therefore ORDERED that judgment is to be entered in favor of plaintiffs and against defendant in the amount of $381,-294.62.