**UTAH FARM PRODUCTION CREDIT ASSOCIATION, Plaintiff and Appellant,**

v.

**COX, Jeffery J. and Elliott J., a co-partnership, Elliott J. Cox, Jeffery J. Cox, Yvonne Cox, Blanche Cox, United States of America, Phillips Petroleum Company, Tracy-Collins Bank and Trust Company, Bank of Ephraim, Defendants and Respondents.**

No. 16885.

Supreme Court of Utah.

March 9, 1981.

HALL, Justice:

Plaintiff Utah Farm Production Credit Association appeals that portion of a lower court ruling which granted a setoff against judgment in plaintiff's favor, the setoff arising from plaintiff's alleged breach of a contract to lend money.

Defendant Jeffery Cox (hereinafter "defendant") is a resident of Sanpete County, Utah, and was, at all times relevant to this appeal, in the business of raising and selling turkeys. In 1972, defendant opened a line of credit with plaintiff, a business entity which extends financing for turkey-growing operations in the Sanpete County area. Plaintiff's standard method of financing was to approve and commit a loan of an agreed amount to a turkey grower, and to take in return a promissory note and security interests in real and personal property. In defendant's case, plaintiff took mortgages in certain parcels of real property, together with pledges of personal property and proceeds from turkey sales. The original 1972 note was renewed annually as defendant sought to finance each succeeding year's crop.[1] The last such renewal took place on February 9, 1976, in the amount of $167,995.29.

In the fall of 1976, defendant resolved to dissolve his turkey-growing enterprise, sell the farm and all future dividends (referred to as "retains") from the Moroni Feed Company, a farmer's cooperative in Sanpete County, and apply the proceeds to his debt to plaintiff. Upon communicating this plan to plaintiff's loan officer, Stephen L. Adamson, however, defendant learned that it would still leave plaintiff unacceptably under-collateralized. Adamson therefore proposed an alternate arrangement. Thereunder, the existing debt would be extended for another year. In addition, plaintiff would finance the purchase of 60,000 poults together with the expenses of raising and selling them. Defendant and Adamson worked out a budget together which projected a sizeable profit by the end of the

---

1. During none of the years of defendant's dealings with plaintiff was he able to turn a net profit.

year. In return for the financing, defendant was required to pledge his stock in the Moroni Coal Company, an operation controlled by defendant and his father, Elliott Cox. Defendant's father refused to pledge his interest in the company, but Adamson indicated that the loan would be approved in any case, and, in reliance thereon, defendant removed his farm and Moroni Feed Company "retains" from the market. Defendant also took delivery of the first 20,000 poults. When the loan was not immediately forthcoming, defendant secured a separate loan of $2,500 from the Bank of Ephraim to cover expenses incident to the care of the poults.

Plaintiff routinely submits all loan applications to a supervisory loan board for approval. While loan agents such as Adamson sometimes may give verbal "approval" of loans to growers before such approval is actually granted by the supervisory board, and even authorize growers to begin purchases before the supervisory board passes on the loan, the agents have no express approval authority. In the instant case, plaintiff's supervisory board resolved to refuse the loan absent the additional pledge of Elliott Cox's shares in the Moroni Coal Company, who once again refused. Plaintiff thereupon announced an immediate foreclosure of all security interests underlying the outstanding debt between plaintiff and defendant. Defendant returned to his original plan, "to sell out and pay them off," and went to work as a truck driver for Moroni Coal Company on April 4, 1977.

Plaintiff brought action in the lower court on the debt outstanding. Defendant counterclaimed, seeking damages (for plaintiff's breach of contract to make the agreed-upon loan) in an amount equal to the loss of profits which would have been made during the 1977 growing season. Following a trial to the court sitting without jury, plaintiff was awarded the amount of the promissory note, offset by defendant's damages. This latter figure was arrived at by a finding that defendant would have realized a gross profit for 1977 of $38,587.20 (representing a profit of four cents per pound—an industry average—on 60,000 poults), $28,940.40 (representing "retains" to be paid defendant by Moroni Feed Company in 1982, in the estimated average amount of six cents per pound discounted to present value), for a total of $67,127.60. This figure was then reduced by that amount saved by defendant due to the breach, which included: operation expenses of $6,900, interest payments of $9,000, rent in the amount of $3,500, and wages from his position with Moroni Coal Company of $7,200. The court then added $4,000 as prejudgment interest on the damages due defendant, for a net offset in the amount of $44,927.60. It is from this ruling that plaintiffs take the present appeal.

Plaintiff first assigns error to the trial court's ruling on the grounds that defendant failed in his legal duty to mitigate damages. We agree and reverse the trial court's decision.

 Where a contractual agreement has been breached by a party thereto, the aggrieved party is entitled to those damages that will put him in as good a position as he would have been had the other party performed pursuant to the agreement.[2] A corollary to this rule is that the aggrieved party may not, either by action or inaction, aggravate the injury occasioned by the breach, but has a duty actively to mitigate his damages.[3] The application of these two principles to the breach of a contract to loan money yields a rule recently set forth in a separate opinion in the case of *Cox Corporation v. Dugger*,[4] wherein it was stated that:

The normal measure of damages for breach of a contract to loan money is the

2. *Keller v. Deseret Mortuary Co.*, 23 Utah 2d 1, 455 P.2d 197 (1969).

3. *Thompson v. Jacobsen*, 23 Utah 2d 359, 463 P.2d 801 (1970); *Morrison v. Perry*, 104 Utah 151, 140 P.2d 772 (1943).

4. Utah, 583 P.2d 96 (1978) (dissenting opinion of Justice Maughan, dissenting on other grounds).

difference, if any, between the interest rate contemplated in the contract between the parties, and the rate the borrower obtained in the alternate loan; plus the expenses of obtaining the second loan. But where the borrower is unable to obtain money elsewhere, and the defendant knew of the particular purpose for which the money was needed, special damages may be recovered, provided they are not speculative or remote.[5] [Citations omitted.]

In other words, the would-be borrower, upon learning that the supposed lender refuses to perform the contract, must actively seek alternative sources of financing. Only where such a search fails to yield an alternative source may the aggrieved party seek special damages, including lost profits, to compensate for the breach.[6] The denial of special damages, and particularly lost profits, where other financing was available, or where it was not sought, is based on sound policy. Where an alternative financing source is available, other damages due to the breach are generally avoidable, and hence not compensable.

■ In the instant case, it is undisputed that defendant failed to seek alternative financial sources upon learning that plaintiff refused to extend the agreed-upon loan for the 1977 growing year. By defendant's own admission, the Moroni Feed Company was at least one other such source available, even if it was only for the next year's financing. Moreover, defendant did, in fact, procure short-term financing of a small sum from the Bank of Ephraim. None of these alternatives were explored upon learning of plaintiff's breach.

Defendant argues, however, that he believed such exploration to be futile in light of plaintiff's announcement of immediate foreclosure. Defendant reasoned that, as plaintiff would seek foreclosure and sale of defendant's physical facility for turkey growing, there would be little virtue in seeking an alternative loan for the 1977 growing year. As such, defendant resolved simply to sell the farm himself and seek to repay the obligation.

The argument is without merit. Had he sought alternative financing, defendant may well have been able to satisfy the debt in full, thereby rendering any threat of foreclosure meaningless. Had he been able to secure even a lesser loan from an alternative source so as to demonstrate his good faith and desire to continue the turkey business, he may have been able to stave off the threat of foreclosure. Such financing could only have enhanced plaintiff's security interest in defendant's property without the assumption of any additional risk on plaintiff's part. Even assuming that plaintiff would proceed with foreclosure in the face of additional financing, defendant had six months to exercise his statutory rights of redemption on any property foreclosed upon by plaintiff.[7] At any rate, by failing to investigate such alternatives, defendant failed in his duty to mitigate damages, and the special damages contemplated by the trial court's ruling may not be allowed.

The above decision works no undue hardship on defendant. In fact, it places him in the same position in which he sought to place himself at the conclusion of the 1976 growing year. The lost profits for which he now seeks compensation are those which, but for the urgings of plaintiff, he would never have sought to earn in the first place.

In light of the foregoing, we need not address other points raised on appeal which go to the merits of defendant's counterclaim.

■ Plaintiff also challenges the court's denial of attorney's fees. Counsel for plaintiff testified that from the lawsuit's inception until he rested his case in chief, he and his associate had spent 49 hours on the case. He testified that it would be difficult to know how many hours would eventually be spent on the case (including the sale of the

---

5. Id., at page 100.

6. See generally, 11 Williston on Contracts, § 1411; Restatement 1, Contracts, § 343.

7. U.C.A., 1953, 78–37–6; 70A–9–506; and Rule 69(f), U.R.C.P.

property and any deficiency claim) but that he anticipated spending an additional 25 hours in connection with the trial itself. He testified that if billing on an hourly basis, he would charge $50.00 an hour, but that he considered time to be only one factor to be taken into consideration in a case of this type. He then said that "it is my opinion that a reasonable fee for this matter would be approximately 10 percent of the balance due on the account ... or a figure of $15,000." It is crucial to note that there was no distinction drawn between fees associated with plaintiff's complaint on the debt owed and those associated with defendant's counterclaim. In the case of *Stubbs v. Hemmert*,[8] this Court ruled that the plaintiff was not entitled to reimbursement for fees he had incurred in defending a counterclaim in a foreclosure action. A party is therefore entitled only to those fees resulting from its principal cause of action for which there is a contractual (or statutory) obligation for attorney's fees.

■ There appears to have been little dispute in the instant case as to plaintiff's complaint on the debt owed. The primary focus at trial was defendant's counterclaim. The trial court found that "[b]ecause of the dispute, each party shall pay their [sic] own attorney's fees." Because plaintiff failed in its proof, the court was left without a means to determine the portion of plaintiff's fees spent in *prosecuting* its complaint and the portion spent in *defending* the counterclaim. Based upon the evidence presented, we are not convinced that the trial court abused its discretion in ruling as it did.

The case is hereby reversed and remanded for further proceedings consistent with this opinion. No costs awarded.

MAUGHAN, C. J., HOWE and OAKS, J., concur.

STEWART, J., dissents.

8. Utah, 567 P.2d 168 (1977).

