69 F.3d 548
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 TRIAX PACIFIC, INC., a Utah corporation,
Plaintiff-Counterdefendant-Appellant,
v.
AMERICAN INSURANCE COMPANY, a foreign corporation, and
Fireman's Fund Insurance Company, a foreign
corporation,
Defendants-Counterclaimants-Appellees.
 No. 94-4091.
(D.C.No. 90-CV-1036)
 United States Court of Appeals, Tenth Circuit.
 Nov. 2, 1995.
 
 Before BALDOCK, HOLLOWAY, and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT[1]
 HOLLOWAY, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.[2]
 
 
 2
 Plaintiff Triax Pacific, Inc. appeals from the district court's order granting summary judgment in favor of the defendants on all of plaintiff's breach of contract and promissory estoppel claims. We affirm.
 
 
 3
 * In late July or early August 1990, RG & B Contractors, Inc. defaulted on its contract with the Department of the Navy for renovation of 169 housing units on the island of Guam. R. at 60, 74, 122, 164, 228. Defendants American Insurance Company and Fireman's Fund were RG & B's sureties on the Navy contract.[3] Id. at 1, 13, 61, 74. After the default, defendants solicited bids from plaintiff and other contractors for completion of the construction work left unfinished. Id. at 61, 105. Defendants hired John Sevier as their agent to solicit bids and make recommendations. Id. at 306.
 
 
 4
 As part of the bidding process, defendants supplied the bidders, including plaintiff Triax, with a written Invitation for Bids. Id. at 76, 106. The Invitation for Bids provided that a "contract for completion will be entered into between the successful bidder and the Surety." Id. at 106. It further provided that any bid would be subject to approval of the Navy. Id.
 
 
 5
 Plaintiff submitted its written bid prior to the bidding deadline but later withdrew the bid when it discovered an $800,000 error. Id. at 61, 112-13. On October 5, 1990, defendants' agent Sevier wrote defendants indicating that even if the error were accounted for, plaintiff would have been the low bidder. Id. at 114.
 
 
 6
 On October 30, 1990, Mr. Sevier telephoned Robert Christiansen, plaintiff's vice president. According to Mr. Christiansen's deposition testimony, their conversation proceeded as follows:
 
 
 7
 John Sevier called me up and said: "How would you like to go to work in Guam?"
 
 
 8
 And I said, "I'd love to."
 
 
 9
 He says: "Will you take it at the price you have submitted?"
 
 
 10
 And I said: "What price?"
 
 
 11
 And he said: "Your corrected bid with the eight hundred thousand."
 
 
 12
 And I said: "Yes, we'll take the job at that price."
 
 
 13
 Id. at 405. Mr. Sevier then stated "the job is yours, providing you can go out there to the government and prove to them that you are a competent contractor....By the way, they are deleting the SSP credit. Please do a credit proposal for that to submit to the Navy when you get there." Id. at 522. Plaintiff alleges that during this conversation, Mr. Sevier also promised to tender plaintiff to the Navy as completion contractor. Id.
 
 
 14
 Also on October 30, 1990, Mr. Sevier sent a fax to Mr. Christiansen requesting that plaintiff be prepared to respond to the Navy's correspondence deleting certain Specialized Supplemental Personnel from the completion contract at the meeting to be held in Guam. Id. at 118. Mr. Christiansen prepared an estimate for contract modification showing a credit of $233,604 toward plaintiff's previously-submitted bid amount. Id. at 121, 211-12.
 
 
 15
 On November 3, 1990, plaintiff's representatives, including its president, accompanied Mr. Sevier to Guam. Id. at 62, 79. Mr. Sevier also invited representatives of another contractor, International Bridge CorporationWestern Alaska Contractors, to travel to Guam at the same time. Id. at 70, 179. On November 5, 1990, plaintiff presented its qualifications to the Navy in Guam. Id. at 63.
 
 
 16
 During the November 5 meeting, the Navy's representative, Mr. Putnam, explained that defendants had three options for dealing with RG & B's default: (1) completing a takeover contract with a contractor; (2) doing nothing and allowing the Navy to reprocure the project; or (3) tendering a contractor to the Navy. Plaintiff's representatives were informed that defendants had not yet selected an option and the Navy could not proceed in drafting a contract with an acceptable contractor until they did so. Id. at 202-03.
 
 
 17
 Mr. Sevier did inform the Navy representative that defendants wanted to tender plaintiff as replacement contractor. Mr. Sevier further requested that plaintiff be allowed to inventory materials stored by RG & B. Id. at 63, 102. A Navy representative accompanied plaintiff's representatives to the jobsite where they began an inventory. Id. at 63, 202, 217. Representatives of Western Alaska Contractors also performed an inventory of the jobsite. Id. at 79.
 
 
 18
 On November 5, Mr. Sevier also requested a "best and final offer" from both plaintiff and Western Alaska. Id. at 79. Plaintiff's representatives objected that they believed they already had been awarded the contract. Mr. Sevier was apologetic but explained that defendants wanted him to obtain new bids. Id. at 329-30. Plaintiff Triax presented a revised, verbal bid of $10,869,000 in exchange for the deletion of certain inspection work on the project. Id. at 63-64, 71, 181, 217. Western Alaska also provided a new bid in the amount of $10,996,000, but indicated that they might further reduce their bid to $10,769,000. Id. at 70, 134-35.
 
 
 19
 After receipt of the plaintiff's best and final offer, Mr. Sevier again told plaintiff's representatives that they were the low bidder and would be signing a contract with the Navy. Id. at 64, 181, 218. Mr. Sevier requested that the representatives meet with the Navy again on November 7. Id. at 64. On the morning of November 7, 1990, plaintiff's representatives met with Mr. Sevier. He presented them with a bottle of champagne and told them they were the recipients of the contract. Id. at 64-65, 207-08, 218-19. He also stated that the only remaining step would be to obtain the approval of, and sign a contract with, the Navy. Id. at 208, 219.
 
 
 20
 Later that day, plaintiff's representatives met with Mr. Sevier and Mr. Putnam of the Navy. The meeting did not go as expected because Mr. Putnam indicated he had just received a letter from Mr. Seidl, defendants' counsel, in which defendants had elected to have the Navy reprocure the project rather than selecting the replacement contractor themselves. Id. at 129-30, 182, 333-34. Mr. Putnam told the parties that he believed it would be necessary for the Navy to obtain new bidding due to the reprocurement. Id. at 222, 452-53. What was said next is a matter of some dispute, but plaintiff's representatives left the meeting without an agreement by the Navy to accept plaintiff as replacement contractor.
 
 
 21
 Moreover, Mr. Putnam testified that there was no reasonable way that the Navy could have signed a contract at that point in any event. The takeover contract had not been prepared. The Navy was still working on draft language for the release and exoneration agreement to be entered into between the Navy and the defendants. There were still problems with the specifications which needed to be discussed. Id. at 231-32. (In fact, the completion contract was not finalized until January 1991. Id. at 302.)
 
 
 22
 Plaintiff's representatives left Guam and returned to Utah. They decided to contact defendants directly to "find out what the problem was." Id. at 320. Plaintiff's president called George McCarthy, the manager of defendants' San Francisco surety claims office, on November 12, 1990. Mr. McCarthy indicated there must have been some confusion and reassured him that plaintiff would be tendered to the Navy. Id. at 58, 65, 224.
 
 
 23
 Plaintiff's representatives met with representatives of the defendants on November 14, 1990, in San Francisco. They contacted Mr. Putnam, the Navy representative, by speaker phone. Mr. Alexander, defendants' senior surety supervisor, identified plaintiff Triax as the contractor defendants wanted to tender to the Navy during this conversation. Mr. Putnam agreed to accept plaintiff upon receipt of written confirmation. Id. at 57-58, 65-66, 246.
 
 
 24
 Subsequent to the meeting on November 14, 1990, plaintiff was requested to submit a written commitment reflecting its best and final offer and the other terms discussed in Guam, which it did on November 16, 1990. Id. at 66, 141, 226. The commitment included the cost of curing items on a list of defects which was shown to plaintiff's representatives on November 7, 1990, in Guam. Id. at 142. The list included a revised credit for deletion of a special inspection program in the amount of $385,000, which had been discussed during the Guam trip. Id.
 
 
 25
 Defendants replied to the commitment letter on November 21, 1990, objecting to some of its terms as non-conforming to the bidding instructions. R. at 66, 143. Defendants indicated that they had received conforming proposals in the interim and that all current proposals would be considered. Id. at 144.
 
 
 26
 Defendants wrote plaintiff on December 5, 1990, stating plaintiff would have to lower its bid or not be eligible for the contract. Id. at 66. Plaintiff refused to lower its bid. Mr. Sevier recommended to defendants that they use Western Alaska because of its lower bid. Id. at 301. Defendants gave Western Alaska written notice of acceptance of their bid and tendered them to the Navy on January 18, 1991. Id. at 72, 175-76. Plaintiff Triax brought this action alleging breach of contract and promissory estoppel theories.
 
 II
 
 27
 As a threshold matter, defendants challenge our jurisdiction to consider plaintiff's appeal.
 
 
 28
 Plaintiff filed its notice of appeal on March 29, 1994, thirty-two days after the entry of summary judgment and twenty-seven days after the magistrate judge assigned to hear pretrial matters denied plaintiff's motion to amend its complaint to state a cause of action in tort. Defendants contend that plaintiff's appeal from the order granting summary judgment was untimely.
 
 
 29
 Defendants' motion to dismiss is clearly without merit. Plaintiff's notice of appeal was not untimely; it was premature. The summary judgment order did not dispose of the defendants' counterclaim. An order becomes final and appealable only when it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. See Van Cauwenberghe v. Biard, 486 U.S. 517, 521-22 (1988); 28 U.S.C. 1291. Defendants' counterclaim was voluntarily dismissed on December 1, 1994, after notice from this court of the apparent prematurity of the appeal. Once this counterclaim was dismissed, Triax's premature notice of appeal ripened and a new notice of appeal was unnecessary. See Lewis v. B.F. Goodrich Co., 850 F.2d 641, 645 (10th Cir.1988)(discussing procedure where premature notice of appeal is filed). It is of no moment that the premature notice of appeal was filed more than thirty days after the order granting summary judgment was entered.[4]
 
 III
 
 30
 We turn now to the merits of plaintiff's appeal. "We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c)." Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir.1994)(citing Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990)). "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " Hagelin for President Comm. v. Graves, 25 F.3d 956, 959 (10th Cir.1994)(quoting Fed.R.Civ.P. 56(c)), cert. denied, 115 S.Ct. 934 (1995).
 
 
 31
 * The first count of plaintiff's complaint seeks damages for breach of an oral contract to award the construction contract to plaintiff. Plaintiff contends that this contract was formed during the telephone conversation between John Sevier and Robert Christiansen on October 30, 1990.[5]
 
 
 32
 Defendants argue the alleged contract is barred by the statute of frauds. Defendants further contend that there was no "meeting of the minds" sufficient to form a binding contract. We need not reach the issue whether the purported contract falls within the statute of frauds because we agree that no binding contract was formed under the facts presented.
 
 
 33
 Under Utah contract law, a construction bid constitutes an offer which, if unconditionally accepted, forms a binding contract. R.J. Daum Constr. Co. v. Child, 247 P.2d 817, 819 (Utah 1952). Such acceptance "requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby." Id.; see also Cal Wadsworth Constr. v. City of St. George, 898 P.2d 1372, 1376 (Utah 1995). If such terms have not been completely agreed upon, however, or will not be final until memorialized in writing, there is no contract:
 
 
 34
 [I]f the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract.
 
 
 35
 Daum, 247 P.2d at 820, quoting Restatement of Contracts 26, cmt. a. See also Cessna Fin. Corp. v. Meyer, 575 P.2d 1048, 1050 (Utah 1978)(no contract formed unless there is a meeting of the minds as to all of its essential terms); Engineering Assocs., Inc. v. Irving Place Assocs., Inc., 622 P.2d 784, 787 (Utah 1980)(omission of material terms prevents formation of contract, and if contracting parties make it clear that they do not intend that there should be legal consequences unless and until a formal writing is executed, there is no contract until that time); Crismon v. Western Co. of N. Am., 742 P.2d 1219, 1221 (Utah App.1987)(preliminary negotiations do not form contract).
 
 
 36
 Here, plaintiff Triax withdrew its bid. Rather than soliciting a new bid, defendants made a direct counteroffer to plaintiff for completion of the project. However, the Invitation for Bids clearly contemplated that any such contract for completion would be in writing. Plaintiff could not reasonably have believed that Mr. Sevier's oral statements alone constituted agreement as to all material terms of the construction contract. There remained many items to be resolved, most notably the credit to be given for deletion of the specialized supplemental personnel and the identity of the contracting parties (i.e., whether plaintiff would be contracting with defendants or directly with the Navy). Negotiations continued during November 1990 and broke down after that time.
 
 
 37
 Once negotiations broke down with plaintiff, defendants were free to accept an offer from a competing bidder:
 
 
 38
 When bids are solicited and are sent in for simultaneous opening, or for consideration all together, a bidder should usually be held reasonable in supposing that a bid is rejected as soon as one of the competing bids is accepted. But a mere notice of acceptance may not have any operation in this latter case, for the reason that a formal written contract is contemplated. It has been held that each bid remains open for acceptance for a reasonable time so long as no contract with a competing bidder has actually been consummated.
 
 
 39
 J. Perillo, Corbin on Contracts 3.41 (2d ed.1993) (emphasis added).
 
 
 40
 It is undisputed that plaintiff Triax continued the negotiating process by submitting a subsequent "best and final offer," that plaintiff's attempted written memorial of these terms was rejected by defendants as non-conforming, and that plaintiff never signed the contemplated written contract with the defendants or the Navy. We conclude that no valid, binding construction contract was formed between plaintiff and the defendants as the result of the conversation of October 30, 1990. The district court properly entered summary judgment on the first count of plaintiff's complaint.
 
 B
 
 41
 The second count of plaintiff's complaint alleges the formation of a contract on November 7, 1990, after plaintiff submitted its best and final offer. R. at 6, 27. This count is styled "Breach of Contract Arising from Oral Solicitation, Oral Modifications of Solicitation, Offer and Acceptance." However, the district court generously construed this count, at plaintiff's request, to allege the breach of a contract to tender plaintiff Triax to the Navy as replacement contractor. Id. at 607. For this reason, we likewise analyze Count II on a contract to tender theory only.
 
 
 42
 We agree with the district court that this alleged contract also fails because plaintiff gave no valid consideration for defendants' promise to tender plaintiff to the Navy and because there is no evidence of a meeting of the minds sufficient to form the alleged contract to tender. Defendants admit having promised to tender plaintiff to the Navy. However, to constitute consideration for a binding contract, the promise must have been "bargained for" by plaintiff. Restatement (Second) of Contracts 71 (1981). It is clear from the evidence of record that plaintiff's bid, its best and final offer, and the negotiations which resulted therefrom, were entered into in the hope of winning the construction contract, and were not bargained for consideration for the alleged promise to be tendered to the Navy. Any promise to tender was merely gratuitous. See Zoby v. American Fidelity Co., 242 F.2d 76, 78-79 (4th Cir.1957).
 
 
 43
 For the same reason, there was no "meeting of the minds" sufficient to form the alleged contract to tender. Moreover, there was also no contract formed based on submission of a revised bid. The Invitation for Bids made any such contract subject to approval by the Navy. The Navy never gave its approval. Under the circumstances, the parties' preliminary negotiations did not lead to contract formation. See Cessna Fin. Corp., 622 P.2d at 787.
 
 
 44
 We have carefully reviewed the evidentiary materials cited by plaintiff as supporting its contention that the promise to tender was part of an oral contract. We have been hindered, however, due to inadequate record citations. (In several critical instances, citations are grossly overinclusive, such as citing over 90 pages of deposition testimony in support of a single factual assertion.) However, our review of these materials confirms the conclusion of the district judge that the promise to tender "did not contain the material terms necessary to constitute a binding, enforceable contract." R. at 638.
 
 
 45
 For these reasons we are persuaded that summary judgment for the defendants on the second count of the complaint was correct. We have also considered other arguments related to this claim and find that they lack merit.
 
 C
 
 46
 In the third and final count of its complaint plaintiff Triax avers a promissory estoppel claim. It alleges that it reasonably relied to its detriment on defendants' promises. More specifically, plaintiff says it refrained from bidding on other jobs and incurred costs of traveling to Guam and preparing to perform the construction work for defendants.
 
 
 47
 Utah has adopted the test for promissory estoppel contained in the Restatement (Second) of Contracts 90 (1981). See Tolboe Constr. Co. v. Staker Paving & Constr. Co., 682 P.2d 843, 845 (Utah 1984). The Restatement requires that a plaintiff prove three elements for such a promissory estoppel claim:
 
 
 48
 1. The promise must be one which the promisor should reasonably expect to induce action or forbearance on the part of the promisee;
 
 
 49
 2. The promise should induce such action or forbearance; and
 
 
 50
 3. Injustice can be avoided only by enforcement of the promise.
 
 
 51
 The Supreme Court of Utah has further promulgated a set of factual prerequisites for a promissory estoppel claim, as follows:
 
 
 52
 that the defendants were aware of all the material facts; that in such awareness they made the promise when they knew that the plaintiff was acting in reliance on it; that the latter, observing reasonable care and prudence, acted in reliance on the promise and got into a position where it suffered a loss.
 
 
 53
 Tolboe, 682 P.2d at 845-46.
 
 The doctrine of promissory estoppel
 
 54
 is resorted to only where circumstances are such that equity and good conscience render its application imperative in order to avoid an obvious unfairness and injustice.... [T]he promise or representation relied on must be sufficiently definite and certain that the plaintiff acting as a reasonable and prudent person under the circumstances would be justified in placing reliance upon it; and in case of uncertainty or doubt the responsibility is upon the plaintiff to ascertain the facts before acting upon it.
 
 
 55
 Petty v. Gindy Mfg. Corp., 404 P.2d 30, 32 (Utah 1965) (footnotes omitted).
 
 
 56
 Plaintiff, in response to defendants' interrogatories, asserted that the promise on which it relies was made on November 7, 1990, when Mr. Sevier informed plaintiff's representatives that Triax was the recipient of the contract and would be tendered to the Navy. However, the alleged promise to tender plaintiff to the Navy cannot form the basis for promissory estoppel based upon the criteria outlined above. That promise was made within the context of the process of negotiating the construction contract, which would not be binding until the written document was signed, for the reasons outlined above. Under the circumstances, any promises made were part of preliminary negotiations and could not form the basis for a claim of promissory estoppel. Cf. Lavoie v. Safecare Health Serv., Inc., 840 P.2d 239, 249-51 (Wyo.1992)(applying 90 promissory estoppel principles). The undisputed facts and circumstances here show that as the promisor, defendants would not reasonably expect action or forbearance by Triax until a written contract was consummated. Thus the plaintiff failed to show that its reliance on statements of defendants or their agent was reasonable. Id. at 250-51.
 
 IV
 
 57
 The judgment of the United States District Court for the District of Utah is affirmed.
 
 Entered for the Court
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 We have considered the request for oral argument by plaintiff and find that argument would not be beneficial
 
 
 [3]
 American Insurance Company is a wholly owned subsidiary of Fireman's Fund Insurance Company. The two companies are referred to collectively as "defendants" throughout this opinion
 
 
 [4]
 Moreover, the summary judgment order was also not final so long as Triax's motion to amend its complaint remained outstanding. Triax did not properly object in the district court to the magistrate's denial of its motion to amend. For this reason, we cannot consider the merits of Triax's appeal from the magistrate's order. See In re Griego, 64 F.3d 580, 583 (10th Cir.1995)(party waives objections to magistrate's order not presented to district court). However, the existence of the pending motion before the magistrate prevented the order granting summary judgment from becoming final for purposes of appeal
 
 
 [5]
 The record does not clearly reflect the district court's basis for granting summary judgment to the defendants on this count of plaintiff's complaint. The court's minute order states that it granted summary judgment on Counts I and III because it "found no cause of action." R. at 569. Nevertheless we can affirm a trial court's entry of summary judgment upon any basis which appears of record. Jones v. Unisys Corp, 54 F.3d 624, 628 (10th Cir.1995)