Donald **BECKER** and Bernice Becker, Plaintiffs,

v.

**HSA/WEXFORD BANCGROUP, L.L.C.,** a foreign corporation, Defendant.

No. 2:99–CV–300C.

United States District Court, D. Utah, Central Division.

Aug. 1, 2001.

Jeffrey L. Silvestrini, Brian F. Roberts, Cohne Rappaport & Segal, Salt Lake City, UT, for plaintiffs.

Paul D. Veasy, Robert D. Grant, Parsons Behle & Latimer, Salt Lake City, UT, for defendant.

### ORDER

CAMPBELL, District Judge.

In this diversity suit, Plaintiffs Donald and Bernice Becker ("the Beckers") allege that Defendant HSA/Wexford Bancgroup ("Wexford") defaulted on its $4,900,000 loan commitment to the Beckers. This matter is now before the court on Wexford's motion for summary judgment, Wexford's motion for partial summary judgment on the issue of damages, and Wexford's motion to strike the affidavit of Mr. Becker. The facts are set forth in the parties' pleadings and will not be repeated except as necessary to explain the court's decision. For the reasons set forth below, Wexford's motions for summary judgment are denied.

#### Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir.1997).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Gonzales v. Millers Cas. Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991). The non-moving party must set forth specific facts showing a genuine issue for trial; mere allegations and references to the pleadings will not suffice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### Discussion

##### I. Motion for Summary Judgment

###### A. Breach of contract

The first count of the Beckers' complaint alleges that a binding contract existed between the Beckers and Wexford and that Wexford breached that contract. In its motion for summary judgment, Wexford makes two arguments in response to this claim: (1) there was no contract between the parties, and (2) to the extent that there

was a contract between the parties, Wexford's performance was excused by the Beckers' failure to abide by certain performance conditions.

### 1. Was there a contract between the parties?

#### a. Conditional acceptance

On September 30, 1998, Wexford sent the Beckers a written Loan Commitment for the Beckers to sign. On October 9, 1998, the Beckers' attorney, the Honorable Judge David Dickinson (in private practice at the time), mailed a letter to Wexford's loan officer, Sean O'Malley. Judge Dickinson's October 9 letter states, in pertinent part:

> It is our understanding, based upon your conversations with Mr. Crisler [the Beckers' loan broker], that HSA/Wexford has agreed that the remaining portion of the commitment fee ($24,500) is to be paid at closing.
>
> This acceptance is expressly made subject to the following conditions:
>
> 1. Incorporation of all agreements of the parties in previous correspondence, including without limitation payment of interest on certain of the reserves.
> 2. Language concerning disposition of the expense deposit, on page 8, apparently was inadvertently deleted. We assume that this is intended to read as in the previous draft dated August 24, 1998.
> 3. HSA/Wexford already has in its possession certain environmental, appraisal and engineering reports, all of which have either formally or informally been accepted by HSA/Wexford. The acceptance of the commitment is

subject to your acceptance of such reports in your possession as satisfying the requirements of the commitment.

(October 9, 1998, Letter from Dickinson to O'Malley (hereinafter "October 9 letter"), attached as Ex. 16 to Pls.' Addendum to Opp. to Mot. for Summ. J. (hereinafter "Addendum")). Wexford did not respond to this letter. On October 13, 1998, the Beckers sent back to Wexford the Loan Commitment with their signatures on it, by which they purported to accept the Loan Commitment. (*See* Loan Commitment, attached as Ex. 14 to Addendum).

■ Wexford contends that the Beckers' acceptance of the Loan Commitment was ineffective because the October 9 letter represented a conditional acceptance, and a conditional acceptance of an offer constitutes a rejection and a counteroffer. As the Utah Supreme Court has explained:

> [A]n acceptance requires manifestation of unconditional agreement to all of the terms of the offer.... [T]here must be made manifest a definite intention to accept the offer ... without material reservations or conditions.... A conditional acceptance is in effect a statement that the offeree is willing to enter into a bargain differing in some respect from that proposed in the original offer. The conditional acceptance is, therefore, itself a counter-offer and rejects that original offer, so that thereafter even an unqualified acceptance of that offer will not form a contract.

*Upland Indus. Corp. v. Pacific Gamble Robinson Co.,* 684 P.2d 638, 641 (Utah 1984) [1]; *accord Cal Wadsworth Constr. v. City of St. George,* 898 P.2d 1372, 1376 (Utah 1995) ("An acceptance must uncon-

---

1. The parties agree that Utah law governs this case. (*See* Compl. at ¶ 4; Wexford's Mem. in Supp. of Mot. for Summ. J. at 22.)

ditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer."); *Triax Pacific, Inc. v. American Ins. Co.*, No. 94–4091, 1995 WL 643156, at *4 (10th Cir.Nov.2, 1995), *quoting R.J. Daum Constr. Co. v. Child*, 122 Utah 194, 247 P.2d 817, 819 (1952) (acceptance "requires manifestation of unconditional agreement to all of the terms of the offer and an intention to be bound thereby").

The October 9 letter does contain language that could be seen as a conditional acceptance. The letter reads "[t]his acceptance is expressly made subject to the following conditions" and "[t]he acceptance of the commitment is subject to your acceptance of such reports in your possession as satisfying the requirements of the commitment." (October 9 letter, attached as Ex. 16 to Addendum.) The Beckers assert, however, that the October 9 letter was simply making reference to prior oral agreements between the parties that were not reflected in the written Loan Commitment. According to the Beckers, the October 9 letter was not a conditional acceptance because it did not put forth any new conditions, but rather only acknowledged conditions to which the parties had already agreed. For example, Judge Dickinson testified in his deposition that the October 9 letter was meant to confirm the prior oral agreement of the parties to postpone the Beckers' payment of the commitment fee until closing. (*See* Dickinson Dep. at 48–50, attached as Ex. D to Addendum.) At this stage of the proceedings, the court must construe all factual allegations in the light most favorable to the Beckers. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *Pueblo of Santa Ana*, 104 F.3d at 1552. The Beckers have put forth a plausible explanation of the October 9 letter, and a reasonable jury could find that the October 9 letter did not represent a conditional acceptance of the Loan Commitment offer.

### b. Acceptance through action

The Beckers also contend that, even if the October 9 letter did represent a rejection of the written Loan Commitment and a counteroffer, Wexford subsequently indicated its acceptance of the Beckers' counteroffer through its conduct. "If the original offeror accepts the counteroffer before it is withdrawn, a binding contract is created." *Cal Wadsworth Constr.*, 898 P.2d at 1378. Indeed, Wexford's actions after October 9, which included processing and/or solidifying the funding for a loan to the Beckers, suggest that Wexford may have believed that a binding contract existed between the parties. For example, on October 23, 1998, the law firm representing Wexford sent Judge Dickinson a letter which stated that "this closing is going to be delayed beyond the original scheduled date." (Letter from Stephen A. Alderman to Judge Dickinson, attached as Ex. 23 to Addendum.) The reference to the "closing" suggests that Wexford believed that there was still a loan transaction between the parties which was subsequently to be closed.

A party can indicate its intention to enter into a binding contract through its actions rather than its signature.

It is axiomatic that a party may become bound through its performance to a contract that it has not signed ... It is a fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract.... It is established that a signature is not always necessary to create a binding agreement.... It is likewise es-

tablished that the purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown through the conduct of the parties.... That [a party] failed to sign the agreement is immaterial for any written contract though signed only by one of the parties binds the other if he accepts it and both act in reliance on it as a valid contract.... If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document.

*Commercial Union Assocs. v. Clayton,* 863 P.2d 29, 34 (Utah Ct.App.1993) (quoting various sources) (internal citations and quotations omitted); *accord Estate Landscape and Snow Removal Specialists, Inc., v. Mountain States Tel. and Tel. Co.,* 844 P.2d 322, 330 (Utah 1992) ("[A] party's conduct may be conclusive proof of acceptance ...").

■ Wexford makes two responses to the suggestion that it could have accepted a counteroffer from the Beckers' through its conduct. First, Wexford suggests that the fact that the written Loan Commitment is 29 pages long, contains over a hundred provisions, and involved a fairly complex loan transaction for nearly $5,000,000 indicates that the parties intended that the contract would be binding only after a written Loan Commitment was signed by both parties. "It is well settled that if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed ..." *Reagan v. Bankers Trust Co.,* 863 F.Supp. 1511, 1519 (D.Utah 1994). While this may be true as a general matter, it is not dispositive here. Although it appears as though the parties intended that their agreement would be finalized by a written contract, this does not absolutely preclude a contract accepted through conduct—if that was indeed the intent of the parties.

Second, Wexford asserts that its actions after October 9 were not indicative of processing an existing loan but instead indicate that Wexford was contemplating whether or not to accept the Beckers' alleged counteroffer. In the context of a motion for summary judgment, however, the court must accept all reasonable factual allegations in the light most favorable to the Beckers. A reasonable jury could find that the Beckers' version of the facts is correct, and that Wexford's actions after October 9 indicate that an offer and acceptance had been made.

### 2. Did the Beckers breach their performance conditions?

■ Wexford next contends that, if there was a valid contract between the parties, the contract is reflected in the written Loan Commitment, and the Beckers did not comply with the conditions of the Loan Commitment. A loan commitment is a contract and should be interpreted using traditional principles of contract law. *See Brown–Marx Assocs. Ltd. v. Emigrant Sav. Bank,* 703 F.2d 1361, 1366–67 (11th Cir.1983); *Reagan,* 863 F.Supp. at 1512. Pursuant to contract law, a bank is generally not required to perform its obligations under a loan agreement unless a borrower has strictly complied with all conditions precedent.

Courts have usually treated the terms and conditions of a loan commitment as conditions precedent to the lender's obligation to perform.... Concerning ... express condition[s], 5 Williston on Contracts (Third Edition), Section 675, states: 'As a general rule, conditions which are either expressed or implied in fact must be exactly fulfilled or no liability can arise on the promise which such conditions qualify.' ... [The bank's]

'commitment' to make the loan to plaintiffs as reflected in its Commitment Letter must thus be read in light of its own express conditions, strictly enforced. . . . 'If the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies.' *Reagan,* 863 F.Supp. at 1512 (citations omitted); *accord Brown–Marx,* 703 F.2d at 1366–67. According to Wexford, its performance under the contract was excused by the Beckers' failure to abide by two contract conditions: (1) the condition requiring the Beckers to submit a $24,500 commitment fee within ten days of the signing of the contract, expressed in Article K of the written Loan Commitment; and (2) the condition that the Beckers submit various reports and assessments at least fifteen days prior to the expiration date of the Loan Agreement, expressed in the third paragraph of the General Conditions to Commitment (a document attached to and incorporated by the Loan Commitment). (*See* Loan Commitment at 9, 12, attached as Ex. 14 to Addendum.)

### a. *Commitment fee*

### 1. *Non-integrated contract*

█ The Beckers concede that they did not pay $24,500 to Wexford in the time required by Article K, but they advance two reasons why this does not excuse Wexford's performance under the contract. First, the Beckers assert that payment of the commitment fee as required by Article K was not a condition of the contract at all. According to the Beckers, the parties had orally agreed before the written Loan Commitment was drafted that the Beckers could postpone payment of the commitment fee until closing; because of time concerns, Wexford mistakenly used a form Loan Commitment and forgot to include this oral agreement. As

evidence of this, the Beckers point to various sources of evidence extrinsic to the written Loan Commitment: (1) Crisler testified in his deposition that he and O'Malley agreed that the commitment fee could be postponed until closing (*see* Crisler Dep. at 52–53, 55–59, 62, 83–88, 113, attached as Ex. C to Addendum); (2) Judge Dickinson testified in his deposition that he had between three and five conversations with either O'Malley or Wexford's attorney, Richard Merel, confirming the oral agreement to postpone the commitment fee, and in which he was told that the written Loan Commitment had been prepared in haste and had mistakenly omitted this agreement (*see* Dickinson Dep. at 46–48, 167–68, 176–77, attached as Ex. D to Addendum); and (3) several letters from Judge Dickinson to Wexford which refer to this alleged agreement to defer payment of the commitment fee went unresponded to and unrebutted by Wexford (*see* Letters of September 1, October 1, and October 9, attached as Exs. 11, 15, and 16 to Addendum).

█ This extrinsic evidence may only be considered if the court finds that the parol evidence rule does not apply here. "The cardinal rule in construing any contract must be to give effect to the intention of the parties. If possible, those intentions must be determined from an examination of the text of the agreements." *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987). The Beckers assert, however, that the parol evidence rule does not apply in this case because the written contract was not intended by the parties to be an integration—the final agreement between the parties.

The parol evidence rule as a principle of contract interpretation has a very narrow application. Simply stated, the rule operates in the absence of fraud to ex-

clude contemporaneous conversations, statements, or representations offered for the purpose of varying or adding to the terms of an integrated contract.... Therefore, a court must first determine whether the writing was intended by the parties to be an integration. In resolving this preliminary question of fact, parol evidence, indeed any relevant evidence, is admissible.

*Union Bank v. Swenson,* 707 P.2d 663, 665 (Utah 1985); *accord* RESTATEMENT (SECOND) OF CONTRACTS (hereinafter "RESTATEMENT") § 209(2) (1979) ("Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule."); *Id.* at § 209 cmt. c ("Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence.").

■ Wexford's arguments in response are not persuasive. Wexford contends that the policy of requiring binding written contracts for loan commitments counsels against finding that any contract between the parties was non-integrated. The integrity of written contracts is maintained, however, "by applying a rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it appears to be." *Union Bank,* 707 P.2d at 665. "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." RESTATEMENT § 209(3). This presumption, however, is rebuttable, and a reasonable jury could conclude that the above evidence of an oral agreement to postpone payment of the commitment fee

was sufficient to rebut the presumption of an integrated contract.

■ Wexford also points to various provisions of the written Loan Commitment, such as the "Merger" clause and the "No Oral Change" clause, asserting that no oral agreements are binding upon the parties. (*See* Loan Commitment ¶ 9 at 25, ¶ 12 at 26–27, attached as Ex. 14 to Addendum.) While this may represent evidence that the Loan Commitment did constitute the full agreement between the parties, a contract may be shown to be non-integrated despite the presence of these types of clauses in a contract. *See FMA Fin. Corp. v. Pro–Printers,* 590 P.2d 803, 805 (Utah 1979) (finding that parties had agreed to an option to purchase leased equipment, despite fact that written contract lacked such an agreement and contained an integration clause, where defendant admitted at trial that it regularly granted such options as part of its business practice); *accord* RESTATEMENT § 209 cmt. b ("Written contracts, signed by both parties, may include an explicit declaration that there are no other agreements between the parties, but such a declaration may not be conclusive.")

The record shows that there remain disputed issues of material fact regarding whether the written Loan Commitment was meant to be an integrated contract and whether the parties had indeed orally agreed to postpone payment of the commitment fee until closing.

### b. Waiver

■ The Beckers also assert that, even if payment of the commitment fee at the time indicated in Article K was a condition of the contract, strict compliance with this condition was waived by Wexford. "A party to a contract, who is entitled to demand performance of a condition precedent, may waive the same, either ex-

pressly or by acts evidencing such intention; and performance of a condition precedent to taking effect of the contract may be waived by the acts of the parties in treating the agreement as in effect." *Ahrendt v. Bobbitt,* 119 Utah 465, 229 P.2d 296, 297 (1951); *accord Caldwell v. Anschutz Drilling Co.,* 13 Utah 2d 177, 369 P.2d 964, 966 (1962) (cited with approval in *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of Am.,* 984 F.2d 1551, 1557 (10th Cir.1992)). According to the Beckers, Wexford waived strict compliance with Article K by continuing to process the Beckers' loan after the date indicated in Article K had come and gone, even though Article K by its own terms states that "this Commitment shall terminate and shall be of no further force and effect" in the event of noncompliance with that provision. (Loan Commitment Art. K at 9, attached as Ex. 14 to Addendum.) [2]

There is evidence in the record, discussed above, upon which a reasonable jury could conclude that, even if the parties had not agreed that the Beckers could pay the commitment fee at closing, that Wexford waived prompt payment of this fee.

### b. Reports and assessments

■ Wexford also contends that its performance is excused because the Beckers failed to submit various reports and assessments at least fifteen days prior to the expiration date of the Loan Agreement, as expressly required by the written Loan Commitment. The Beckers acknowledge that they did not submit these reports and assessments to Wexford but

explain that this occurred only because Wexford made an anticipatory breach of the contract by indicating that its funding for the Beckers' loan had fallen through.

■ "It is well settled that an action may be maintained for breach of contract based upon the anticipatory repudiation by one of the parties to the contract. An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent not to render its promised performance." *Cobabe v. Stanger,* 844 P.2d 298, 302 (Utah 1992). "The [non-breaching] party can immediately treat the anticipatory repudiation as a breach, or it can continue to treat the contract as operable and urge performance without waiving any right to sue for that repudiation." *Kasco Servs. Corp. v. Benson,* 831 P.2d 86, 89 (Utah 1992). The Beckers claim that O'Malley's alleged anticipatory repudiation of the loan commitment was made in conversations which occurred on October 15 and 29, whereas the reports and assessments were not due until November 8. Moreover, Judge Dickinson's October 30, 1998, letter to Wexford indicates that the only reason the Beckers had not yet submitted the requested reports and assessments was because of this alleged anticipatory repudiation by Wexford. (*See* Ex. 25, attached to Addendum).

■ Once again, Wexford points to the "No Oral Change" provision of the written Loan Commitment, which states that termination of the Loan Commitment cannot be made orally. While this provision might arguably require that an official termination of the loan be made in writ-

---

**2.** The written Loan Commitment also contains a provision that states that all waivers must be made in writing. (*See* Loan Commitment ¶9 at 25, attached as Ex. 14 to Addendum.) Notwithstanding such a provision, however, the parties to a contract may still make oral waivers of contract conditions.

*See Softsolutions, Inc. v. Brigham Young Univ.,* 1 P.3d 1095, 1103 (Utah 2000); *Provo City Corp. v. Nielson Scott Co.,* 603 P.2d 803, 806 (Utah 1979) ("Parties to a written contract may modify, waive, or make new contractual terms, even if the contract itself contains a provision to the contrary.").

ing, an anticipatory repudiation can be made orally. *See Upland Ind. Corp. v. Pacific Gamble Robinson Co.*, 684 P.2d 638, 643 (Utah 1984) (anticipatory breach "is the outcome of words or acts evincing an intention to refuse performance in the future"); *accord* RESTATEMENT § 250 (indicating that anticipatory repudiation is typically made by way of a "statement").

Accordingly, there are disputed issues of material fact regarding whether Wexford's contract performance was excused by the Beckers' alleged failure to submit various reports and assessments, precluding summary judgment on this issue.

For the above reasons, Wexford's motion for summary judgment on the first count of the Beckers' complaint is denied.

### B. Non-contract theories of recovery

The second and third counts of the Beckers' complaint assert that, even if there was never a valid contract between the parties, the Beckers may still recover damages under theories of quasi-contract or promissory estoppel. Wexford's motion for summary judgment seeks to dismiss these two counts.

#### 1. Quasi-contract

 "The elements of a quasi-contract, or a contract implied in law, are: (1) the defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Davies v. Olson*, 746 P.2d 264, 269 (Utah App.1987), *citing Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984). Here, the Beckers have raised and submitted evidence that (1) Wexford received a $15,000

expense deposit and a $5,000 application fee from the Beckers (*see* Becker Aff. at ¶ 30 (as amended)), (2) Wexford was aware of the fees paid to it by the Beckers (*see, e.g.*, Ex. 29, attached to Addendum), and (3) it would be unjust for Wexford to keep these fees because Wexford induced the Beckers to pay these fees in exchange for services and then failed to provide the services promised (*see, e.g.*, Exs. 25 and 29, attached to Addendum).

 Wexford responds to this claim with two arguments. First, Wexford asserts that a plaintiff may not recover under both contract law and quasi-contract law remedies. "Recovery in quasi contract is not available where there is an express contract covering the subject matter of the litigation." *Mann v. American W. Life Ins. Co.*, 586 P.2d 461, 465 (Utah 1978); *accord Davies*, 746 P.2d at 269. A party may not recover under a theory of implied contract, however, only if the express contract which governs the obligations between the parties in the case is found to be enforceable. *See Bailey–Allen Co., Inc. v. Kurzet*, 876 P.2d 421, 425 (Utah Ct.App. 1994). Here, the Beckers' contract law and quasi-contract law claims are plead *in the alternative;* until a jury determines whether there was or was not a binding contract between the parties, it would be premature to dismiss the Beckers' quasi-contract claims.

 Second, Wexford insists that it did not benefit from the $20,000 in fees it received from the Beckers because those fees were used to process the loan and were paid out to third parties. Wexford has not presented any evidence of this assertion.[3] Moreover, a jury could con-

---

3. In support of this contention, Wexford cites to "Exhibit 27." (*See* Mem. in Supp. of Mot. for Summ. J. at 13, Reply Mem. in Supp. of Mot. for Summ. J. at 6–7.) Exhibit 27, how-

ever, has not been submitted to the court (rather, it appears to have been an exhibit presented at the deposition of Mr. Crisler, *see*

clude that Wexford did not spend $20,000 within only a few weeks to process a loan, especially a loan for which, according to the Beckers, Wexford was unable to provide funding.

### 2. Promissory estoppel

▮▮▮ The necessary elements of promissory estoppel include:

(1) a promise reasonably expected to induce reliance; (2) reasonable reliance inducing action or forbearance on the part of the promisee or a third person; and (3) detriment to the promisee or third person.... The factual prerequisites for promissory estoppel are: that the defendants were aware of all the material facts; that in such awareness they made the promise when they knew that the plaintiff was acting in reliance on it; that the latter, observing reasonable care and prudence, acted in reliance on the promise and got into a position where it suffered a loss.

*Andreason v. Aetna Cas. & Sur. Co.,* 848 P.2d 171, 174–75 (Utah Ct.App.1993) (internal citations and quotations omitted). The Beckers allege that these three elements have been met because: (1) Wexford represented to the Beckers, both orally and through its actions in continuing to process the loan, that there was a valid loan commitment between the parties; (2) the Beckers relied on these representations from Wexford; and (3) the Beckers suffered damages (by paying fees to Wexford, by paying to perform Wexford's loan conditions, by having to find another lender who would only loan to the Beckers at a higher interest rate, etc.).

Wexford responds that the Beckers' claim for promissory estoppel cannot survive because any reliance by the Beckers was unreasonable. (*See* Wexford's Mem.

Crisler Dep. at 81–82, attached as Ex. C to

in Supp. of Mot. for Summ. J. at 33–35.) Given the Beckers' allegations that Wexford continued to deal with the Beckers and continued to indicate that it was processing a valid loan, it cannot be said as a matter of law that any reliance by the Beckers' on Wexford's representations was unreasonable.

For the reasons set forth above, Wexford's motion for summary judgment is denied.

### II. Motion for Partial Summary Judgment on the Issue of Damages

▮▮ As an alternative to its motion for summary judgment, Wexford has also submitted a motion for partial summary judgment on the issue of damages. According to Wexford, even if Wexford breached a valid loan commitment to the Beckers, the Beckers cannot recover because they suffered no calculable damages from that breach.

Wexford makes several arguments in support of its contention that the Beckers should be denied damages. First, Wexford asserts that it is impossible to calculate damages in this case. In *Utah Farm Prod. Credit Ass'n v. Cox,* 627 P.2d 62 (Utah 1981), the Utah Supreme Court commented that

[t]he normal measure of damages for breach of a contract to loan money is the difference, if any, between the interest rate contemplated in the contract between the parties, and the rate the borrower obtained in the alternate loan; plus the expenses of obtaining the second loan. But where the borrower is unable to obtain money elsewhere, and the defendant knew of the particular purpose for which the money was needed, special damages may be recovered,

Addendum).

provided they are not speculative or remote.

*Id.* at 65. Wexford contends that it is impossible to calculate damages in this case because the rate of the Beckers' prospective loan with Wexford was never finalized. Although the Beckers' loan with Wexford was approved under an assumed rate of 7.9%, that rate was never locked in; under the terms of the Loan Commitment, a condition precedent to "rate lock" was the Beckers' tender of the $24,500 loan commitment fee. (*See* Loan Commitment Art. B at 2, attached as Ex. 14 to Addendum.) According to Wexford, because the Beckers never paid the loan commitment fee, the rate was never "locked", and there is no way to know what the "real" interest rate on the Beckers' loan would have been. Therefore, the interest rate cannot be subtracted from the interest rate the Beckers' subsequently received from Bank Midwest to calculate damages. As discussed above, however, the Beckers' have raised disputed questions of material fact regarding whether (1) Wexford allowed the Beckers to delay payment of the loan commitment fee, pursuant to either an express agreement or a waiver of a contract condition, and (2) Wexford made an anticipatory repudiation of the Loan Commitment. If the Beckers succeed in proving these allegations to a jury, certainly Wexford cannot avoid damages by way of its own breach of contract. Furthermore, the Beckers contend that "rate lock" is not necessary in this case because the written Loan Commitment contemplates that the annual percentage rate on the loan will be calculated as a certain number of basis points above the standard fifteen-year U.S. Treasury bond rate.

Wexford also contends that it is impossible to calculate damages in this case because the Beckers' subsequent loan with Bank Midwest was based on very different terms—there was a different annual percentage rate, the loan amount was different, and the loan was secured with different collateral. According to Wexford, this makes the Beckers' Wexford loan incomparable with the loan they subsequently obtained from Bank Midwest. Wexford has raised no evidence of this assertion, and it has not explained why experts in banking law could not testify at trial as to the proper amount of damages in this case. Although the lack of "rate lock" and the different terms of the Bank Midwest loan may perhaps make damages more difficult to calculate, the court does not find that it makes damages impossible to calculate.

Second, Wexford contends that any loss by the Beckers was not causally connected to Wexford's alleged breach of contract. In support of this contention, Wexford points to Judge Dickinson's deposition testimony that "Mr. Becker had made it clear that the deal was dead if we couldn't close it, and as I remember, absolute drop dead deadline was something like November 6th or 5th ..." (*See* Dep. of Dickinson at 129, attached as Ex. D to Addendum.) Since the final date for the closing of the loan was not until November 15 (*see* Ex. 20, attached to Addendum), reasons Wexford, it cannot be liable for damages because the Beckers' deal would have been dead by November 6 regardless of whether Wexford subsequently came up with the loan money by November 15. In response, the Beckers testify that, while November 15 was the absolute deadline for the funding of the loan, they were prepared to pay the necessary fees well in advance of that date, and in advance of November 6, as well. Mr. Becker testifies in his affidavit that he "had the capability to pay the $24,500 at any time during [his] dealings with Wexford ..." (Becker Aff. at ¶ 11.) Wexford's alleged anticipatory repudiation of the loan commitment came as early as October 15, and by October 29 Wexford had allegedly

informed the Beckers that they could not fund the loan at all. There is thus a dispute of material fact regarding whether any damages in this case are causally related to Wexford's alleged breach of contract.

Wexford next asserts that the Beckers cannot recover the fees paid to Wexford for the processing of the loan because such fees were non-refundable. This argument ignores the fact that this is a breach of contract case. Wexford has cited no authority for what must be its underlying contention that, if a bank defaults on its loan commitments, fees paid to the bank are not recoverable by the borrowers if those fees are labeled "non-refundable." The fact that Wexford labeled these fees "non-refundable" does not make them immune from a court judgment.

Finally, Wexford alleges that the Beckers are not entitled to damages because they breached the contract by failing to perform conditions precedent to Wexford's performance. As discussed above, there are material facts in dispute in this case regarding whether there was a contract between the parties at all; if a contract existed, what conditions were included; and whether any such conditions were waived or excused by Wexford's conduct. These disputed questions of material fact preclude summary judgment on this issue.

For the above reasons, Wexford's motion for partial summary judgment on the issue of damages is denied.

### III. Motion to Strike

Finally, Wexford has moved to strike the affidavit of Mr. Becker, submitted in opposition to Wexford's summary judgment motions. For the reasons set forth at the beginning of the July 27, 2001, hearing, Wexford's motion to strike is granted in part and denied in part.

*Order*

Wexford's motion for summary judgment is DENIED; Wexford's motion for partial summary judgment on the issue of damages is DENIED; Wexford's motion to strike the affidavit of Donald Becker is GRANTED IN PART AND DENIED IN PART.